## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AUDRA SWAIN<br>6170 Marsh Island Drive<br>Chincoteague, VA 23336 | * |
| | * |
| *Plaintiff*, | * |
| v. | *  Case No. _____ |
| PARAMOUNT GLOBAL INC.<br>d/b/a PARAMOUNT GLOBAL<br>1515 Broadway<br>New York, NY 10036 | *<br>*  JURY TRIAL DEMANDED<br>* |
| Serve On: | * |
| CSC-LAWYERS INCORPORATING SERVICE<br>7 Saint Paul Street, Suite 820<br>Baltimore, MD 21202 | * |
| and | * |
| GEORGE CHEEKS, Individually<br>West Street Condo<br>425 W. 50th Street, PH-D<br>New York, NY 10019 | * |
| and | * |
| WENDY A. MCMAHON, Individually<br>17349 Weddington Street<br>Encino, CA 91316 | * |
| *Defendants*. | * |

*     *     *     *     *     *     *     *     *     *     *     *     *     *

## COMPLAINT AND JURY DEMAND

Now comes Plaintiff, Audra Swain ("Ms. Swain"), by and through counsel, and for her

Complaint against Defendants, Paramount Global Inc. d/b/a Paramount Global (including

ViacomCBS, Inc., CBS Corporation, CBS Stations, WJZ-TV CBS Baltimore, and any other subsidiaries and affiliated companies) (collectively "Paramount"), states as follows:

## JURISDICTION AND VENUE

1.      This is a proceeding for damages and injunctive relief to redress the deprivation of rights secured to Ms. Swain by the whistleblower protections of Sarbanes-Oxley Act ("SOX"), 18 U.S.C § 1514A *et seq.*; Family Medical Leave Act ("FMLA"); Americans with Disabilities Act ("ADA"), 42 U.S. Code § 12112 *et seq.*, the Maryland Fair Employment Practices Act ("FEPA"), Md. Code, State Govt. Art. ("SG"), §20-606 *et seq.* ("Title 20"); and Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code, Lab. & Emp. ("LE") § 3-501 *et seq.*

2.      Plaintiff's primary residence is currently located at 6170 Marsh Island Drive, Chincoteague, Virginia. At the time of Plaintiff's employment and all relevant events, through December 2023, Plaintiff was a resident and maintained her primary residence in the State of Maryland, located in Baltimore City. Plaintiff filed a charge of discrimination against Paramount Global with the U.S. Equal Employment Opportunity Commission ("EEOC") ("EEOC Charge") complaining of discrimination, based on her disability and retaliation based on her requests for reasonable accommodations. Plaintiff filed a complaint under SOX for retaliation with the Occupational Safety and Health Administration ("OSHA") on March 13, 2023 ("OSHA Complaint"). Plaintiff entered into a mutual tolling agreement with Defendants, which tolled Plaintiff's statutes of limitations for all legal claims against Defendants related to her employment with Defendants, effective July 7, 2022, through the end of the notice period, ending March 13, 2023.

3.      On January 25, 2024, more than 180 days having elapsed since the filing of her EEOC Charge on March 10, 2023, Ms. Swain requested administrative closure of her EEOC Charge in order to receive a notice of right to sue letter from the EEOC.

4.      On February 2, 2024, more than 180 days having elapsed since the filing of her EEOC Charge, the EEOC issued and Ms. Swain received a notice informing her of her right to sue Defendants in court. Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title 20 of Maryland's State Government Article ("Title 20") and the ADA.

5.      More than 180 days have elapsed since the date that Plaintiff filed a complaint with OSHA based on her claims under SOX. Plaintiff did not and has not engaged in any bad faith conduct to delay the investigation or determination from OSHA beyond 180 days of the filing of Plaintiff's SOX whistleblower retaliation complaint with OSHA on March 13, 2023. Plaintiff is therefore entitled to *de novo* review in the U.S. District Court, pursuant to 29 C.F.R. § 1980.114.

6.      Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title 20 of Maryland's State Government Article ("Title 20"), the FMLA, SOX, and MWPCL.

7.      As the unlawful employment practices complained of herein occurred within Baltimore City, Maryland, venue is proper.  Plaintiff has suffered damages.

8.      This court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 29 U.S.C. §2617, because this is a civil action arising under the ADA, FMLA, and SOX. This Court also has supplemental jurisdiction over Plaintiff's related claims arising under state laws including Title 20 and the MWPCL, pursuant to 28 U.S.C. §1367(a).

9.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district, and 28 U.S.C. §1391(b)(3).

## **PARTIES**

10.      At the time of Plaintiff's employment and all relevant events, Plaintiff was a resident and maintained her primary residence in the State of Maryland, located in Baltimore City. Starting in

December 2023 and through the present, Plaintiff's primary residence is located at 6170 Marsh Island Drive, Chincoteague, Virginia. At all times relevant hereto, Ms. Swain was employed by Paramount Global under the subsidiary of CBS Corporation, at its local television station, "WZJ-TV" or "CBS Baltimore" (hereinafter "WJZ") at its station located at 3725 Malden Avenue, Baltimore, Maryland 21211, which is located within Baltimore City, Maryland. Ms. Swain is a person and, at all times relevant, and was an employee, entitled to protection pursuant to the provisions of Title 20, the ADA, FMLA, SOX, and MWPCL.

11.     Defendant, Paramount Global and relevant subsidiaries and affiliates, is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New York. Paramount Global is a foreign corporation registered to operate and conduct business in the State of Maryland where Defendants employed Plaintiff at WJZ, where she managed the station and its employees as the station's Vice President ("VP") and General Manager ("GM"). Defendant constituted Plaintiff's "employer" within the meaning of Title 20, the ADA, FMLA, SOX, and MWPCL at all times relevant. On December 4, 2019, Viacom Inc. n/k/a Paramount Global ("Viacom") merged with and into CBS Corporation ("CBS") in an all-stock transaction (the "Merger"). WJZ is and all times relevant was owned and operated by Paramount Global, or a former entity merged with Paramount Global during the Merger, within its CBS Stations subsidiary.

12.     George Cheeks ("Mr. Cheeks") is an individual whom, upon information and belief, maintains his primary residence in New York, New York. At all times relevant hereto, he served as Chief Executive Officer ("CEO") of CBS and, upon information and belief, made the final decision to withhold Ms. Swain's annual bonus for 2021 when it was due in early 2022. During Ms. Swain's employment and at the time of her termination from Paramount, Mr. Cheeks constitutes an "employer" pursuant to the MWPCL.

13.     Wendy McMahon ("Ms. McMahon") is an individual whom, upon information and belief, maintains her primary residence in Encino, California. At all times relevant hereto, and during Ms. Swain's employment, she served as Co-Head of CBS News & Stations. Upon information and belief, soon after Ms. Swain returned from taking leave related to her disability under the FMLA, and through the months following Ms. Swain's termination from Paramount, Ms. McMahon made the decision to withhold Ms. Swain's annual bonus for 2021 when it was due in early 2022. Ms. McMahon constitutes an "employer" pursuant to the MWPCL.

14.     The facts demonstrate that Ms. Swain is the victim of unlawful discrimination, retaliation, and wage withholding as an employee of Paramount Global.

15.     Paramount Global illegally discriminated and retaliated against Ms. Swain with respect to the terms and conditions of her employment and her termination after she provided dutiful service to Paramount Global in her role as GM, and subsequently withheld her wages in the form of an annual bonus, constituting a significant portion of her annual compensation, despite the station she managed achieving its targets.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

16.     Plaintiff was hired as Vice President ("VP") and General Manager ("GM") of WJZ, the CBS-owned and operated station in Baltimore, Maryland, which is part of Paramount Global, after she interviewed with Peter Dunn ("Mr. Dunn"), the former President of CBS Television Stations. Ms. Swain moved across the country to Baltimore to start her new role with Paramount on September 27, 2017.

17.     Following the offer from Paramount, Ms. Swain resigned her position in Las Vegas, Nevada, where she had spent nearly eight years successfully running Sinclair Broadcast Group's

triopoly of stations affiliated with NBC (*i.e.*, KSNV), the CW (*i.e.*, KVCW), and MyNetwork (*i.e.*, KVMY), and a total of 17 years at Sinclair Broadcast Group in multiple roles.

18.     Immediately after Ms. Swain joined Paramount, she began working to regain the prominence once held by WJZ in the community.

19.     Based on Ms. Swain's efforts to encourage diversity and inclusion, cultivate productive relationships with leaders of all three unions, and maintain an open-door policy for all employees, Ms. Swain was credited with boosting morale across the workforce at WJZ. Further, Ms. Swain helped create a news operation that reflected the demographics of the community— a process that often required Ms. Swain to challenge discriminatory hiring practices. The changes implemented had an immediate impact on the station, including higher news ratings and a revived standard of excellence for WJZ.

20.     As a result of Ms. Swain's hard work and dedication to her staff, by April 2021, a Gallup Survey, commissioned by Paramount for all employees, revealed that Ms. Swain achieved amongst the highest scores of the entire GM group for engagement and leadership. Following Ms. Swain's departure, the General Manager who replaced her, Kathy Hostetter ("Ms. Hostetter"), has not achieved similar results, after starting in the position on or around March 30, 2022.

21.     Further, Ms. Swain invested significant time and energy strengthening relationships in the community. She conceived multiple outreach projects, including but not limited to: (1) "Baltimore: Standing Together"—a series of town hall events, focusing on issues such as public safety and the opioid epidemic, providing on-site solutions by local leaders and community advocates; (2) "#HealthyMD"— an exclusive market partnership utilizing a multi-platform approach with LifeBridge Health, which served to inform the audience about various health concerns, while also serving to promote engagement with WJZ as the connection between the community and

available resources (*i.e.,* The "Mammathon" event to promote Breast Cancer Awareness in October); and (3) an exclusive media partnership with the Baltimore Office of Promotion and the Arts titled "Brilliant Baltimore"— the largest celebration hosted in the city, spanning two weeks and highlighted by "Light City." WJZ's performance achievements that followed in subsequent years would not have been possible without Ms. Swain's hard work and action-oriented focus

22.     Ms. Swain discussed her disabling condition with the Employer's management above her, Ms. McMahon and Ms. Glasgow, during a meeting on August 26, 2021. Ms. Swain further discussed her need to take time off as a result. Ms. Swain later applied for and received FMLA leave related to her disclosed disabling condition. Therefore, the Employer was well aware of Ms. Swain's disabling condition.

23.     Indeed, Ms. Glasgow and Ms. McMahon discussed Ms. Swain's need for time off with her and suggested that she take it; therefore, they clearly perceived Ms. Swain as a person with a disability under the ADA, and were not permitted to discriminate on the basis of such disability or perception of such disability, even if neither knew Ms. Swain's particular diagnosis.

24.     When Ms. Swain initially joined Paramount, the company routinely failed to address cultural and environmental problems, such as a lack of diversity and inclusion, discrimination, retaliation, pay inequity, and hostile work environments, often terminating those who questioned the top levels of management at CBS Television Stations. Ms. Swain actively protected the station she managed from experiencing similar influences from members of corporate leadership, given the positive environment she fostered for the WJZ staff. The stress of balancing the demands of an increasingly hostile corporate team and maintaining a standard of openness and inclusion at the station level, however, took a significant toll on Ms. Swain emotionally and exacerbated symptoms of her disability, which was later diagnosed as Post Traumatic Stress Disorder ("PTSD").

25.     Ms. Swain has, and at all relevant times near the end of her employment, had a diagnosed, long-term medical condition and mental or psychological impairment, which substantially limits her major life activities, including her ability to work, concentrate, think, and communicate.

26.     As early as 2018 to 2019, Ms. Swain developed the mental disability of PTSD, which was further exacerbated by extreme distress caused by her work environment, and threats to her position by members of executive management at Paramount after she complained to supervisors about fraudulent accounting and performance projections related to advertising income. During Ms. Swain's employment with Defendant, Ms. Swain's PTSD substantially limited her major life activities, including her ability to work, concentrate, think, and communicate, requiring Ms. Swain to seek out treatment for her disability.

27.     Regardless of her disabling condition, Ms. Swain was more than qualified for her position and able to meet or exceed all legitimate expectations of her position. Indeed, Ms. Swain's rankings, across many internal surveys of employees under the leadership of Ms. Swain, were among the highest of her peers across Defendant Paramount's broadcast stations.

28.     Ms. Swain's station continued to perform at or above upper management's unreasonable budgetary expectations, as demonstrated by WJZ's budgets and actual performance. By February of 2019, WJZ's performance metrics were rising to record levels, with a number one audience ranking in the morning, noon, evening, and late newscasts. Ms. Swain proved herself as not only an effective and positive leader for WJZ's employees, with the ability and insight to repair CBS's image and reputation within her own station and community, but also a capable driver of performance in the Baltimore market and an asset to the company's profitability. During her last year of employment with Paramount, Ms. Swain and her station continued to exceed its performance

and revenue expectations, while leading the way among the station groups for increased diversity and inclusion.

29.    Ms. Swain consistently met or exceeded every legitimate expectation of management throughout her time at Paramount, which is evident from her performance reviews and incentive awards.

30.    During Ms. Swain's first three years at Paramount, she observed Mr. Dunn's conduct of being openly hostile in meetings and retaliating against subordinates for raising legitimate business concerns, including questionable accounting practices. Mr. Dunn and other members of management working closely with him intimidated employees through threatening emails and phone calls. Mr. Dunn often utilized his immediate direct reports to perpetuate an intimidating culture within the station group and deliver threatening communications. In 2018, following Les Moonves' ("Mr. Moonves") termination, Paramount retained an external law firm to investigate allegations of a systemic toxic culture within CBS.

31.    Within the following year, as a result of the findings of the external law firm's investigation, Mr. Dunn was subsequently investigated, specifically, following multiple complaints from his subordinates and employees within the station group that arose during the investigation.

32.    Given the gravity of his actions, Ms. Swain among others believed that CBS would remove Mr. Dunn from his position of power to prevent further abusive and retaliatory behavior by Mr. Dunn. However, Mr. Dunn retained his position. Rather than improving the situation, there is evidence suggesting that Mr. Dunn escalated his retaliatory behavior and abused his position of power, including by seeking out the identities of any employees who had lodged complaints against him or honestly responded to the inquiries into his conduct during the external investigation.

33.     Paramount's handling of the information obtained in 2018 and 2019 regarding Mr. Dunn's retaliatory conduct contributed to Ms. Swain's reasonable belief that Paramount (then CBS) would not protect employees from retaliation by its managers if or when subordinates reported their illegal conduct.

34.     During the Spring of 2018, Mr. Dunn employed numerous deceptive tactics regarding the company's inventory of advertising time that risked the financial failure of local stations like WJZ and falsely inflated advertising revenue projections. At the same time, Mr. Dunn simultaneously demanded that local station GMs meet their budgeted expectations without adjusting for the disadvantages he caused by removing advertising inventory from the stations.

35.     To further intimidate GMs and others to help cover up his deceptive profit projections, on or around April 26, 2018, Mr. Dunn sent a DVD to all GMs with a handwritten note from "Peter" demanding, "Hit YOUR number" for the individual station budget expectations in the second quarter of 2018. The movie on the DVD, titled "*Glengarry Glen Ross*," follows an openly anti-Semitic and misogynistic company whose managers fire the majority of the employees.

36.     Because of Mr. Dunn's false projections to the Board and thus to shareholders, indicating "new" revenue sources, which were actually the same revenue sources used by station managers to hit their targets previously, Mr. Dunn was concerned that his false assertions would be revealed by the station managers being unable to hit their previous targets without the same advertising inventory. Unbeknownst to the majority of GMs at that time, Mr. Dunn had begun commandeering station inventory for his own gain with no adjustment to the local stations' revenue or expense budgets, which would prevent local stations from achieving their targets, or at least lower what would have otherwise been a year in which advertising revenue was likely to increase. This gesture on April 26, 2018, is one of many instances in which Mr. Dunn intended to intimidate

subordinates to ensure employees remained quiet about his financial indiscretions and deceptive framing of CBS Television Station's revenue.

37.     Each local station among CBS television stations, including WJZ, is expected to meet or exceed annual revenue goals, most of which are met through generating and selling advertising time, the value of which is increased by gaining audience within the individual markets.  Therefore, increasing the amount of time a local station is allotted to sell to advertisers increases the station's revenue possibilities; taking time away removes inventory from each station, thus directly decreasing revenue.

38.     Mr. Dunn and others manipulated this model to misrepresent the performance of CBS Television Stations as a group, potentially hindering the individual stations' ability to exceed certain local revenue thresholds specific to their market. Revenue and profit projections provided to the Board by Mr. Dunn and others incorporated these false and inflated numbers.

39.     During the first quarter of 2018, Michael Wittman ("Mr. Wittman"), Senior VP & Controller of CBS Television Stations, announced, during the weekly controller conference call, a "new" revenue vertical called "AudNet." The idea behind AudNet was to sell unsold inventory across the CBS Television Stations.  Mr. Wittman stated, "If they [the sales force] can't sell the inventory, we will."  At that time, Mr. Wittman did not mention AudNet or the removal of local inventory to GMs or to the sales managers.  Ms. Swain was extremely familiar with the "AudNet" product, having been exposed to it while working for Sinclair Broadcast Group, the creator of "AudNet" in 2015. The product was developed by Steve Marks, Chief of Operations ("COO") of Sinclair Broadcast Group, in an effort to sell unsold, less sought-after "inventory" or time slots, largely for independent stations such as CW and MyNetwork stations.

40.     During Ms. Swain's tenure at Sinclair Broadcast Group, Ms. Swain was chosen by Mr. Marks to write the company's Best Practices for Pricing and Inventory Management, given her ethical and strategic knowledge and ability to maximize inventory for profit.  Given Ms. Swain's background, she was aware that most of the profits associated with AudNet are illusory and do not represent additional revenue when advertising time is removed from stations who would otherwise sell such time to advertisers.  Indeed, the majority of dollars generated by AudNet at CBS stations was came from existing local station advertisers who, by purchasing advertising time through AudNet, received an extremely discounted rate compared to what the same advertiser would have paid to local stations if purchasing the time directly.

41.     In addition, because the time allocated to AudNet was unavailable to be sold by the station once pulled from the local station by Mr. Dunn, there was an additional revenue loss due to the reduction in advertising time available to sell to other advertisers at considerably higher rates than those offered through the AudNet product during the same time periods.  The loss of total available advertising slots was particularly problematic during election years given the demand for advertising.

42.     Prior to learning Mr. Dunn's dealings regarding AudNet, Ms. Swain learned that Mr. Marks intended to reach out to other broadcast companies to partner with Sinclair on AudNet to fulfill the audience levels that advertisers purchasing the platform were promised.  Upon information and belief, Mr. Dunn was the only executive who returned his call for a potential partnership with AudNet.

43.     Upon deciding to move forward with AudNet for the CBS stations, Mr. Dunn hired Julio Marenghi ("Mr. Marenghi") to oversee the project.  Mr. Marenghi was a close personal friend of Mr. Dunn, having known each other for nearly 40 years.  Mr. Marenghi was a previous employee of Mr. Dunn and CBS.  Upon information and belief, Mr. Dunn did so because he believed that Mr. Marenghi would go along with Mr. Dunn's false projections that Mr. Dunn sought to give to the Board

and shareholders and further Mr. Dunn's efforts to falsely amplify Mr. Dunn's performance numbers through AudNet.

44.     Initially, WJZ's corporate management, including Mr. Dunn with Mr. Marenghi, siphoned off four minutes of sales inventory per day from the local stations. That meant that each CBS station had four minutes less to sell to advertisers than it did before the AudNet partnership. Ms. Swain discovered that corporate leadership had secured the four minutes of inventory from each station and sold it as a group, in partnership with Sinclair through AudNet, creating direct competition with Paramount's cable assets for advertising dollars.

45.     Soon, it became clear to Ms. Swain that Mr. Dunn's motivation for using AudNet was the ability to redirect revenue from the local stations to the collective CBS Stations group and to represent such income as a "new" revenue stream that Mr. Dunn and others working closely with him could take credit for. However, in reality, the local stations suffered a loss of inventory available to sell. That loss was coupled with a loss of revenue from existing advertisers on the stations, who elected to shift their advertising purchases to AudNet at significantly reduced rates.  In many cases, the time purchased was already booked on the local stations and the advertisers' orders were subsequently cancelled after learning of AudNet's pricing.  The revenue from AudNet was not "new" as Mr. Dunn had misrepresented; instead, the money from advertising purchases, which was at substantially reduced rates, took a different path to CBS, bypassing the local stations.

46.     None of the revenues collected through AudNet were allocated to the local stations, such as in performance metrics, nor were the local station revenue goals lowered as a result of having less inventory available to sell.  The local stations were left with the same expense budget, which included film payments for programming where inventory had been reduced, resulting in a significant reduction in total profits.

47.     During the 2019 Budget Meeting on October 1, 2018 – attended by Mr. Dunn, Mr. Wittman, Michelle Scaringella ("Ms. Scaringella"), Chief Financial Officer ("CFO") for CBS Television Stations, and Jim Sullivan ("Mr. Sullivan"), President of Sales for CBS Television Stations, Ms. Swain inquired whether AudNet revenue would be allocated back to the local stations where the revenue was actually realized, given that was the process at Sinclair Broadcast Group. Ms. Swain also asked if upper management would be reducing revenue projections in the 2019 budget as a result of the decrease in time available to sell at the station level. Such questions by Ms. Swain emphasized Ms. Swain's understanding of AudNet to upper management attending the meeting. Mr. Wittman indicated that, should AudNet ever grow to take more than four minutes of airtime per day, corporate leadership would allocate the AudNet revenue to the local stations accordingly in budgetary planning and requirements. After briefly conferring with Mr. Dunn, however, Mr. Wittman stated that a reduction in the revenue budget due to AudNet was not an option, meaning the local stations were expected to make up the revenue elsewhere.

48.     As 2018 drew to a close, and with the potential Viacom and CBS merger, Mr. Dunn and others involved in AudNet continued to misrepresent the product as "new found" revenue for the company in presentations to senior CBS leaders and the Board, as well as shareholders, a claim which Mr. Dunn knew to be false. Soon after, as a result of Mr. Dunn's actions in furtherance of Mr. Dunn's misrepresented revenue numbers, Mr. Dunn rewarded Mr. Meranghi with a promotion to President of Sales (a position that was never posted), despite Mr. Meranghi having been unsuccessful in his past positions at CBS, replacing Mr. Sullivan, who was fired in the fall of 2018.

49.     In early 2019, Mr. Dunn was once again investigated for allegations of discrimination, retaliation and creating a hostile work environment.  Mr. Dunn, having discovered the identity of a direct report who participated in the 2018 external investigation and shed light on the toxic culture Mr.

Dunn created at CBS TV Stations, became openly hostile toward the employee.  On multiple conference calls, Ms. Swain observed Mr. Dunn berating the employee or blatantly ignoring her statements and contributions.  Further, Mr. Dunn terminated a high performing GM who cooperated in an investigation of Mr. Dunn's conduct.

50.     Mr. Dunn's actions perpetuated fears of retaliation for any employee who opposed him, demonstrating that Mr. Dunn was willing to make an employee's conditions of employment unbearable in response to the employee participating in an investigation against him. Mr. Dunn also frequently used subordinates to deliver similar messages to the GMs.

51.     Because Mr. Dunn was permitted to continue in his position, upon information and belief, he was able to continue to engage in a number of illegal practices unabated. Given these actions, it was clear to Ms. Swain that Paramount's management tolerated such illegal conduct, which had a deterring effect on her willingness to speak up.

52.     In February 2019, in an apparent effort to increase his performance metrics, Mr. Dunn and others involved increased the amount of AudNet inventory taken from the local stations from 4 to 11 minutes per day. This drastic increase of inventory allocated to AudNet was disastrous for the stations' ability to meet revenue targets.  At that point, AudNet was taking nearly 35% of the sales inventory between 9:00 AM and 5:00 PM; however, the cost of any syndicated programs inside the same time window remained the sole responsibility of the local stations.  In some instances, AudNet was taking 50% of the available sales time during syndicated programs, but none of the expense costs for the program. These efforts negatively impacted the stations' operating incomes – one of the key metrics for performance evaluation.

53.     Soon after, Ms. Swain called Mr. Meranghi in an attempt to discuss a solution to the repercussions experienced by the local stations. Mr. Meranghi was extremely hostile, however, telling

Ms. Swain to "take [her] fucking Sinclair hat off" – an apparent reference to Ms. Swain's knowledge of AudNet from her tenure with Sinclair Broadcast Group – before abruptly hanging up on Ms. Swain. Thus, Ms. Swain's knowledge of the damage that AudNet could do to the company's revenue was not only blatantly disregarded during relevant meetings but in many instances, her knowledge was overtly despised. In 2019, the amount of inventory taken for AudNet increased to 14 minutes. Mr. Dunn's false projections and misleading use of existing resources that could no longer be used by the local stations to claim new advertising revenue was deceptive and misleading, and constituted fraud on the shareholders, given that he gave these false projections to the Board to incorporate in the company's overall projections.

54.     Throughout the mid-year review meetings in May 2019 and the 2020 budget meetings in September, and with the imminent Viacom and CBS merger, no revenue was ever allocated to the local stations as previously promised.

55.     In October 2019, at a Senior Leadership Meeting in New York City, which included senior executives of Paramount, Mr. Dunn continued to misrepresent the revenue received through AudNet. He repeatedly bragged that he had developed a combined $26 million of "new found" revenue for the company through AudNet. During the last day of the meeting, in an overtly threatening manner, Mr. Dunn asserted that hitting annual budget goals was solely the responsibility of the GMs. Ms. Swain then raised the issue of AudNet taking inventory from stations without management adjusting the stations' budget numbers – a question which challenged Mr. Dunn's false statements that AudNet brought in "new" revenue. Mr. Dunn became irate, angered by Ms. Swain's willingness to raise the accurate facts contradicting his illusory revenue "increases."

56.     In front of Ms. Swain's peers and senior executives of Paramount, Mr. Dunn and Mr. Meranghi mocked Ms. Swain, regarding Ms. Swain's opposing position on the "benefits" of AudNet.

Mr. Wittman also joined the effort to berate Ms. Swain, at one point screaming out that WJZ was worth "$1.4 million," attempting to discredit Ms. Swain's concerns regarding AudNet and the impact on WJZ's (and other local stations') profitability.

57.     Although Ms. Swain continued to succeed to the best of her ability within the limitations imposed on her, Ms. Swain's concerns were centered on the false representation of AudNet as new revenue, as Mr. Dunn and others in upper management continued to maintain. These false projections were given to Paramount throughout the company's due diligence discussions related to the merger of CBS with Paramount. It was not only a misrepresentation of Mr. Dunn's so-called achievements, but it was a false representation to senior executives of the sources of revenue available to the company.

58.     During a break in the meeting, Ms. Swain spoke to Andy Siegel ("Mr. Siegel"), then the Senior VP and Assistant General Counsel for CBS Television Stations. Mr. Siegel and Ms. Swain discussed why corporate management did not allocate the AudNet revenue to each respective local market. Mr. Siegel informed Ms. Swain that corporate management received monthly reports of revenue payouts by market, which would make allocating the revenue to the individual stations relatively easy. Such information made it clear to Ms. Swain that Mr. Dunn and others benefitting from the false representation of new revenue would make every effort not to draw attention to the fact that AudNet was merely stealing sellable airtime from local stations, not creating a new revenue stream.

59.     Given Mr. Dunn's ongoing misconduct and deceptive practices, which were already known to his leadership, and Ms. Swain's repeated efforts to raise concerns about the deceptive practices, Paramount egregiously failed to properly monitor Mr. Dunn and his abusive treatment of

subordinates. Such failures and lack of oversight by the Board of Mr. Dunn's conduct led to false misrepresentations of the company's anticipated revenues and performance.

60.     Shortly after the meetings in New York, Mr. Dunn informed the general managers that he was taking an additional 90 seconds from the local stations during the highly profitable 6:00 PM newscasts for AudNet. The AudNet break would air between the end of the 6:00 PM local newscast and the start of the evening news. Mr. Dunn chose to start airing the AudNet break on Monday, December 2, 2019. Mr. Dunn's decision to take time for AudNet advertising (which typically consisted of direct response marketing advertisers, who, theoretically, would utilize lightly sold areas such as "overnights"), was directly contrary to the initially stated goal of the AudNet product – to sell unsold airtime. December 2, 2019, however, was also the launch of the new Evening News with Norah O'Donnell, based in Washington, D.C., in which CBS had heavily invested. Mr. Dunn's actions likely reduced viewership, as the airing of direct response advertising can negatively impact an audience's view of the value of upcoming programing.

61.     By the beginning of 2020, Mr. Dunn and other executives involved had commandeered between 13-15 minutes of advertising time daily from the local stations, continuing Mr. Dunn's efforts to inflate his revenue achievements. On paper, Mr. Dunn's gutting of local stations' inventory also gave him license to criticize and threaten the jobs of the local stations' leadership for their "failure" to meet budgeted targets.  Mr. Dunn's allotment of local sales time to AudNet, especially during highly valued inventory inside local newscasts, was particularly troubling given the expectation of a record-breaking year for revenue with the upcoming 2020 presidential election and the high demand created by political advertisements. Obviously, there was no revenue benefit whatsoever that justified the use of AudNet for such timeslots, given the expressed purpose of AudNet was to fill less sought-after units that might otherwise go unsold. It was particularly illogical for upper management to move these

highly desirable units in the local newscasts to AudNet, knowing the rates for AudNet spots were discounted and well below the average rates in which the local stations sell the same time period advertising. Mr. Dunn's conduct, and the conduct of other senior executives involved with the AudNet revenue, was fraudulent and harmful to Paramount and its shareholders.

62.     Late in 2019 and early in 2020, many markets became inundated with political advertising.  As the local stations began rapidly selling their advertising units, the GMs requested the return of the AudNet inventory as previously promised by Mr. Dunn and Mr. Meranghi, in the event political advertising increased. Mr. Dunn and Mr. Meranghi scheduled a conference call with the GMs in late January 2020. Rather than handing back any inventory, Mr. Dunn was highly agitated and stated unequivocally that he would not be returning any inventory to the local stations that year. He suggested that stations instead raise their rates in an effort to bridge the gap between budget expectations and the loss of units to AudNet. He continued that what he now called "AudNet inventory" was officially "off limits" to the local stations.  From the start of Mr. Dunn's decision to partner with Sinclair and its AudNet product, his actions cost Paramount multiple millions of potential advertising dollars from which the company and its shareholders would have otherwise benefitted. That was especially true during 2020, a record-breaking revenue year for broadcast companies due to political advertising.

63.     Throughout this time, Ms. Swain repeatedly challenged Mr. Dunn's efforts to frame AudNet advertising as new revenue—a misrepresentation that Mr. Dunn made to all levels of management and knew to be false.

64.     Surprisingly, Ms. Swain was able to consistently stand out among other GMs despite the obstacles posed by Mr. Dunn and other executives. In the course of her four and a half years at Paramount, Ms. Swain had conceived, presented and launched a series of programs surrounding the Ravens football team – i.e., the "Purple Franchise." Following its launch, the slate of Purple

Programming grew exponentially, creating year-round unique content and leading to revenue in excess of $1 million in real "new" revenue for the WJZ in Baltimore. Due to Ms. Swain's efforts to increase WJZ's annual community outreach, and by creating several market exclusive partnerships, WJZ's market share of advertising dollars grew and it was able to secure an additional $3 million in actual "new" revenue while capitalizing on ratings growth for an increase in traditional revenue.

65.     Ms. Swain also prioritized employee morale and positive leadership, which benefitted her local station and thus Paramount overall. In the fall of 2020, the company commissioned a Gallup Survey of all CBS employees—a practice which Viacom, newly merged with CBS, had engaged in for years. Every division except for CBS Television Stations received their results. The CBS Televsion Stations' results (thus, those applicable to Mr. Dunn) were briefly reviewed during a Zoom meeting of GMs and other leaders. Mr. Dunn's personal survey numbers and those of his division were so poor that the company's senior management team elected to discard the results and instead use the next survey, scheduled for the Spring of 2021, to create a baseline for the division, hoping for better results. Once again, Mr. Dunn's reprehensible actions, mistreatment of subordinates, and failures as a leader were swept under the rug, and he was allowed to continue in his leadership role, maintaining his use of AudNet and continuing to falsely represent revenue numbers to corporate leadership and shareholders.

66.     In December 2020, given Ms. Swain was continuing to succeed in her position and deliver high performance results consistent with company metrics for achievement, she received 110% of her eligible bonus amount for 2020.  Her bonus amount was unsurprising, though, because Ms. Swain had never received less than 100% of her eligible bonus amount for every prior year of her employment with Paramount. Indeed, Ms. Swain's target bonus was a key component of her compensation, as described in her offer letter.

67.     In January of 2021, the L.A. Times published articles accusing Mr. Dunn of racism, misogyny and various other offenses ranging from intimidation and retaliation to certain fraudulent and unethical conduct. Given the high exposure to the public, the company finally placed Mr. Dunn on administrative leave on Monday, January 25, 2021. That same day, Wendy Charest ("Ms. Charest"), Ms. Swain's Regional HR contact, called Ms. Swain to ask about her interactions with Mr. Dunn. During the first conversation, which was focused on Mr. Dunn's discriminatory treatment of employees, Ms. Swain stated that she did not have anything to report regarding the allegations in the articles and that Mr. Dunn mostly left her alone in that regard.

68.     Upon further reflection that evening, however, Ms. Swain called Ms. Charest on the morning of January 26, 2021, and reported in detail Mr. Dunn's ongoing fraudulent reporting of revenue numbers relating to AudNet. Ms. Swain explained to her that it was imperative that corporate leadership know immediately about the misrepresentations of revenue by Mr. Dunn and Mr. Meranghi, among others. Furthermore, Ms. Swain explained that given Mr. Dunn operated as both the President of CBS Television Stations and as the GM of WCBS, he routinely stacked the deck in his favor regarding the performance numbers at WCBS when compared to other stations. This included inflating the budgets for markets other than New York, influencing the revenue allocation of large group advertising deals to bolster New York's revenue performance, and lowering revenue allocated to other stations, thereby influencing the perceived performance of the other individual GMs. Ms. Charest stated that she would immediately report the issues to the pertinent financial and HR divisions.

69.     On February 2, 2021, Ms. Swain participated in a call with Patrick Bynum ("Mr. Bynum"), Senior VP HR for Viacom CBS, and Tia Carter ("Ms. Carter"), VP Change Management, during which Ms. Swain was asked to review a document pertaining to best practices and expectations for the GM group moving forward, demonstrating Ms. Swain was trusted member of the management

team. Ms. Swain again reported the misrepresentations regarding Paramount revenue and the false

numbers created by Mr. Dunn and others involved in the AudNet dealings, as well as other actions,

including, on multiple occasions, threatening Ms. Swain by emphasizing that she was a "single mother

who needed the job." Upon information and belief, following that call Mr. Bynum and/or Ms. Carter

reached out to the external law firm investigating regarding what Ms. Swain reported.

70.     Later in February 2021, Ms. Swain received a call from Mr. Seigel regarding the

investigation into Mr. Dunn. Mr. Seigel pushed Ms. Swain to state to investigators that Mr. Dunn was

"a good guy" with whom she "never had a problem," suggesting Ms. Swain call investigators. Ms.

Swain was not willing to lie to investigators to cover up the activities of Mr. Dunn and others. She

was, however, shocked that Mr. Seigel would attempt to pressure her to do so.

71.     The facts demonstrate that Mr. Dunn's contracts with AudNet cost the company

multiple millions of dollars, and Ms. Swain reported the issues so the financial misrepresentations

could be corrected by Paramount's leadership.  Upon information and belief, such misrepresentations

of tens of millions of dollars in claimed "new" revenue were never corrected for shareholders. Ms.

Swain held a reasonable belief that, by misrepresenting such numbers, the company was violating

federal law relating to fraud against shareholders among other laws under the jurisdiction of the

Securities and Exchange Commission ("SEC"), relating to required filings with federal agencies. This

is particularly so given that Ms. Swain was involved in the due diligence discussions during the merger

between CBS and Paramount.

72.     Ms. Swain's interim supervisor during Mr. Dunn's administrative leave was Bryon

Rubin ("Mr. Rubin"), Chief Operating Officer ("COO") for CBS.

73.     In May 2021, the company hired Wendy McMahon ("Ms. McMahon") to replace Mr.

Dunn.  Ms. Swain immediately engaged in multiple discussions with Ms. McMahon regarding AudNet

and the facts surrounding the misrepresentation of revenue, and the damages to the local stations' revenue.  Ms. McMahon selected Ms. Swain to head a committee of three GMs to do a "deep dive" on the AudNet initiative and discuss the subsequent findings with Mr. Meranghi, before ultimately providing a recommendation for moving forward.

74.     Through the work of Ms. Swain and others on the committee over the next several weeks through June 2021, the significant loss in revenue caused by AudNet was easily made clear. Mr. Meranghi was questioned as part of the committee's review. When faced with the recommendation by Ms. Swain to terminate the CBS owned stations' involvement with AudNet, not even Mr. Meranghi could object. AudNet was officially removed from the CBS Television Stations, effective June 28, 2021.

75.     During the course of the review of AudNet, it was apparent that Mr. Dunn and Mr. Meranghi had presented AudNet to corporate leadership of Paramount as revenue that Mr. Dunn and Mr. Meranghi had created, leading to "$26 Million in new found revenue." In doing so, they failed to disclose that using the product required taking sellable airtime from local stations.  Ms. Swain had reasonably suspected Mr. Dunn and others were making such fraudulent claims.

76.     During the Spring of 2021, Mr. Siegel conducted a meeting that was mandated by the Department of Justice as part of a settlement in response to evidence of collusion between multiple broadcast companies. During the meeting, Ms. Swain raised the issue of AudNet being a Sinclair Broadcast Group product and the ability of Sinclair to impose the rate structure for any CBS Television Station, specifically in markets with both a Sinclair station and a CBS owned station (such as Baltimore). Mr. Siegel was confused and remarked, in front of the entire WJZ sales team and members of his legal team, that AudNet was in fact a CBS Product, believing it was created by Mr. Dunn as Mr. Dunn had claimed.

77.     In June 2021, Ms. McMahon announced on the weekly leadership team Zoom that she intended to hire three regional managers who would directly report to her and serve as supervisors over the local station GMs.  Upon conclusion of the call, Ms. McMahon immediately called Ms. Swain on her cell phone to gauge her interest in seeking one of the positions and inquire about her ability to move for the position. Ms. Swain said she would consider the role, and Ms. McMahon, clearly viewing Ms. Swain as a successful and capable manager, sent a copy of the job description for Ms. Swain's review.

78.     Upon information and belief, Ms. Swain was the only GM in the company to receive a copy of the job description. Furthermore, the Regional Manager positions were never posted.  Ms. Swain ultimately declined to leave her role as GM of WJZ to pursue one of the regional manager positions, as Ms. Swain had moved to Baltimore in a purposeful effort to return home and settle in a long-term position.

79.     On June 11, 2021, one of Ms. Swain's long-term employees committed suicide, and his death was discovered when he failed to report for his shift.  Ms. Swain immediately secured counseling for the WJZ staff and, despite COVID restrictions, scheduled a memorial picnic at the station for employees to honor the memory of their fallen coworker. George Cheeks, Chief Executive Officer ("CEO") of CBS ("Mr. Cheeks"), and Ms. McMahon commended Ms. Swain's leadership throughout the crisis.

80.     In early July 2021, Mr. Cheeks scheduled a meeting with Ms. Swain.  During the Zoom call, Mr. Cheeks thanked Ms. Swain for her leadership and acknowledged that Ms. McMahon had relayed to him that she had been a vital asset to her during her initial time in the position. Ms. Swain also discussed with Mr. Cheeks the ongoing investigation of Mr. Dunn's conduct. Mr. Cheeks admitted that he never reviewed Mr. Dunn's personnel records when Mr. Cheeks joined the company

in March 2020, despite the investigations in 2018 and 2019 of alleged misconduct by Mr. Dunn being well known. He referenced Mr. Dunn's ability to "manage up" and subsequently asked Ms. Swain, "If Peter was such a bad guy, where do I draw the line if people claim 'Peter made me do it'?" Mr. Cheeks also questioned Ms. McMahon's decision-making related to creating regional manager positions, but never indicated any doubt in Ms. Swain's ability to lead or succeed in her position, and instead stated that he looked forward to Ms. Swain being part of the leadership who would effect positive changes within the company.

81.     On July 21, 2021, Ms. McMahon held a conference call with the GM and corporate leadership team to announce the conclusion of the external investigation into Mr. Dunn's conduct.  As a result of the investigation, it was determined that Jay Howell ("Mr. Howell"), President and GM in Los Angeles, and Derek Dalton ("Mr. Dalton"), President and GM in Chicago, were being terminated, effective immediately. In dozens of conversations with Ms. McMahon, Ms. Swain recounted multiple instances of associates of Mr. Dunn, including Mr. Seigel and other members of the corporate team, attempting to cover up the fraudulent conduct by Mr. Dunn; however, they were seemingly safe from any repercussions, which Ms. Swain challenged.

82.     Ms. Swain was troubled by the announcement and called Ms. Glasgow that evening and expressed her concern that the response to the investigation did not address those involved in the misleading AudNet numbers by members of the corporate staff working with Mr. Dunn. Ms. Swain's concerns were in part due to the fact that she had contributed to the investigation of the conduct. Ms. Swain's call to Ms. Glasgow was a protected activity under SOX, during which she reported further information and concerns about the investigation into the AudNet deception. Ms. Swain was particularly troubled about the failure of the company to address the conduct of multiple executives still employed in trusted positions, given the amount of information Ms. Swain had relayed directly to

HR and Ms. McMahon.  Ms. Swain added that it appeared the company was putting the two GMs forward as scapegoats for the fraudulent behavior and ignoring the conduct of those who were actually involved in the deceptive profit projections.

83.     As of July 22, 2021, Ms. Swain had reported to the outside investigators, senior members of the HR team (including Ms. Charest, Ms. Carter and Mr. Bynum), as well as Ms. McMahon, that Mr. Siegel had blatantly attempted to influence the investigation of Mr. Dunn by pushing Ms. Swain not to disclose unfavorable facts related to Mr. Dunn. The fact that Ms. Swain had named other members of leadership during the investigation was particularly intimidating and unnerving for Ms. Swain due to her reasonable fear that such persons would not be removed, but might learn of her involvement in the investigation. At least at that time, Ms. Glasgow appeared to understand the misconduct that Ms. Swain had reported and acknowledged that Ms. Swain had acted as "the moral compass of the company."

84.     On August 2, 2021, Ms. Roark began in her role as President of CBS Television Stations for the East Region. Ms. Swain returned from vacation on the same day and was informed she would be reporting to Ms. Roark.  Ms. Roark then sent emails to Ms. Swain acknowledging all the accolades Ms. McMahon had expressed to Ms. Roark about Ms. Swain and her leadership.

85.     On August 3, 2021, during the weekly leadership Zoom, Ms. McMahon announced that the CBSN streaming launch for WJZ and WFOR would be delayed from the end of the month to the end of the year and provided inaccurate revenue forecasts. Ms. Swain then texted Ms. McMahon that the revenue numbers were incorrect, prompting Ms. McMahon to call Ms. Swain. Ms. McMahon implied that Ms. Swain should have openly questioned the numbers during the call. Ms. Swain emphasized that she had frequently been the one to question corporate leadership and indicated to Ms. McMahon that she did not want to continue being the only person questioning the decisions of upper

management. Ms. McMahon admitted she was expecting too much from Ms. Swain in that regard and stated that she understood her concern. The fact that Mr. Meranghi was still employed and still in a position to misrepresent the sources of his projections, however, demonstrated Ms. Swain's concerns regarding the company terminating the wrong people following the investigation into Mr. Dunn.

86.     During the same call, on August 3, 2021, with Ms. McMahon, Ms. Swain repeated similar concerns to those raised with Ms. Glasgow two weeks prior, regarding the company's decisions and the fact that those involved in the fraudulent AudNet conduct were not held accountable.

87.     Ms. Swain feared retaliation as a result of the information she provided to Ms. McMahon and others regarding members of the corporate staff involved with AudNet. Ms. McMahon disagreed with Ms. Swain and stated that Mr. Howell and Mr. Dalton "deserved a public hanging" given the results of the investigation.

88.     Ms. McMahon stated during the call that, "in 30 days," Ms. Swain would look back on this conversation and realize Ms. McMahon was "foreshadowing the events about to unfold."  Upon information and belief, Ms. McMahon was alluding to members of the corporate staff exiting the company (albeit quietly, with their reputations intact), many as a result of reports allegedly made by Ms. Swain and the findings of the investigation.

89.     During the same call, Ms. Swain stated that she was surprised Mr. Siegel was able to keep his job after pressuring her to tell investigators that Mr. Dunn was a "good guy" and that she did not have negative information to report. Ms. McMahon stated that Mr. Siegel did not report to her and asked Ms. Swain, "Give me a beat" on that one.

90.     During the same conversation, Ms. McMahon also expressed her surprise that Ms. Scaringella, had not ever realized that AudNet was not a CBS product (and therefore, a third-party had

been able to dictate the rates for that inventory of time). Soon after, Mr. Seigel was permitted to resign in lieu of termination and avoided any repercussions for his actions, as Ms. McMahon later confirmed.

91.     On August 23, 2021, WJZ successfully launched CBSN Baltimore, which was celebrated inside the company and due largely to Ms. Swain's leadership. Ms. Swain was quoted positively in multiple media outlets that day.

92.     On August 24, 2021, Ms. Swain sent an email explaining that she was having WiFi issues and would be calling into the weekly leadership call (the first time Ms. Swain called into the meeting rather than appearing on camera). The meeting, scheduled to begin at 11:30 AM, was subsequently pushed to 12:00 PM, which overlapped with an important medical appointment for Ms. Swain.  Because the duration of the call was always 60 minutes, the change created a problem for Ms. Swain, who had scheduled the medical appointment during her lunch break at 12:30 PM.  Nonetheless, Ms. Swain dialed into the call during her break and listened even after being called back to the exam room at approximately 12:45 PM.

93.     Between 12:45 PM and 1:00 PM, Ms. Swain apparently hit "unmute" on her iPhone while she was at her appointment. She was later told that she was overheard saying the word "dumbass."  Ms. Swain has no recollection of saying the word, nor is she aware of who was speaking when her phone was unmuted.

94.     On Wednesday, August 25, 2021, Ms. Swain invited Ms. Roark to attend her monthly "State of the Station" Zoom meeting with the WJZ staff.  During the call, Ms. Swain gave Ms. Roark a thoughtful and generous introduction.  Ms. Swain then reserved time for Q&A at the end of the hour. The meeting was informative and well attended. Ms. Swain was scheduled for her weekly one-on-one with Ms. Roark immediately following the meeting.

95.     Upon joining the Zoom, Ms. Swain was surprised to see Ms. Glasgow on the call as well.  Both Ms. Roark and Ms. Glasgow questioned Ms. Swain as to why she allegedly uttered the word "dumbass" on the call the previous day.  Ms. Roark alleged that Ms. Swain made the statement in reference to Ms. Scaringella, and that the remark was said intentionally. Ms. Swain repeatedly expressed she had no memory of saying the word, either about Ms. Scaringella or regarding anyone else. Ms. Roark then accused Ms. Swain of "inconsistencies" regarding her attendance at the meeting, based on Ms. Swain first stating that she had WiFi issues and later claiming she was at a doctor appointment. Per Ms. Roark, such "inconsistencies" lead to a "lack of trust" in Ms. Swain—a preposterous statement, given she had not even asked Ms. Swain to resolve the alleged "discrepancy." Ms. Swain immediately offered to apologize to Ms. Scaringella and to the entire leadership group for the incident, even though she did not call Ms. Scaringella any derogatory name during the meeting. The call ended with Ms. Roark and Ms. Glasgow stating they "need[ed] the afternoon to consider [Ms. Swain's] response." They stated that they would "circle back" the next day.

96.     On the following day, Ms. Roark and Ms. Glasgow scheduled a morning call with Ms. Swain.  They admonished Ms. Swain for her alleged word slip, explaining that they viewed the word as said intentionally and directed toward Ms. Scaringella.  As a result, Ms. Swain would be required to take a week of unpaid leave as punishment. Ms. Roark, who had only been Ms. Swain's supervisor for 3 weeks, questioned Ms. Swain's leadership and demanded a swift turnaround or Ms. Swain would be subject to further discipline including termination. Ms. Swain was shocked by the tone of the call and the subsequent disciplinary action.

97.     The only reason anyone would presume that Ms. Swain's alleged use of the word "dumbass" was directed at Ms. Scaringella was based on Ms. Swain's report to Ms. McMahon

pertaining to Ms. Scaringella's inappropriate conduct and failure to discover Mr. Dunn's misrepresentations regarding AudNet.

98.     In a subsequent call later that day, Ms. McMahon stated that Ms. Swain had "not been herself" recently. Ms. Swain raised the fact that she had reached out to both Ms. Glasgow and Ms. McMahon to express her significant concerns with the decisions made in response to the investigation. Ms. Swain stated that she was "not ok" and indicated that she believed she had Post Traumatic Stress Disorder ("PTSD") as a result of the abusive workplace environment and stress. At that point in the call, Ms. McMahon credited Ms. Swain's "bravery" in discussing the emotional toll placed on her by the investigation. Ms. McMahon stated that Ms. Swain would not be punished for the "dumbass" statement. Both Ms. Glasgow and Ms. McMahon allegedly approved of Ms. Swain taking medical leave to address her mental health following her scheduled vacation the following week.

99.     Ms. Swain contacted the Employee Assistance Program ("EAP") for counseling and help in finding a therapist, and Ms. Swain obtained an appointment to address her potential PTSD for September 15, 2021. Ms. Swain was subsequently diagnosed with PTSD at the appointment with her healthcare provider, and she began an intense in-person therapy program, requiring two sessions per week and continuing through the remainder of the year.

100.     Ms. Swain applied for FMLA leave to address her disabling condition. During her absence, Ms. Roark sent a note to Ms. Swain's subordinates stating that she was taking a medical leave of absence and that Ms. Roark, in coordination with Chris Cotugno ("Mr. Cotugno"), the VP and GM in Pittsburgh, would assist in running WJZ on an interim basis. Unlike other instances in which a GM had to take a leave of absence, Mr. Cotugno, Ms. Swain's peer, was essentially placed in a superior position over Ms. Swain, despite holding the same position as Ms. Swain at his local station.

101.     During Ms. Swain's leave, her direct reports continued to communicate with her, raising concerns over hostile interactions during the 2022 budget meeting and further attempts to diminish WJZ's accomplishments in what Ms. Swain's employees deemed "a witch hunt" directed at Ms. Swain. In December 2021, Ms. Swain announced her scheduled date to return to the station on January 4, 2022.

102.     Ms. Roark and Ms. McMahon scheduled a "WJZ Business Review" meeting on the second day of Ms. Swain's return to work.  The conference call, which included Ms. Glasgow, was an attack on Ms. Swain's personal character and numerous accomplishments.  Once again, they raised the alleged "dumbass" remark, despite having previously been told the incident was being dismissed without penalty.  Ms. Swain was put on notice that any perceived misstep moving forward would result in her termination, which was part of a broader effort to remove Ms. Swain.

103.     On January 5, 2022, Ms. Swain sent Ms. McMahon a detailed email addressing the allegations brought forth during the call, including discrepancies in Ms. Roark's characterizations regarding Ms. Swain as "having no defined strategy and not being present to lead the station." Ms. McMahon's and Ms. Roark's statements were an overt demonstration of her disapproval related to Ms. Swain's disability-related FMLA leave.

104.     Further statements by Ms. Roark regarding Ms. Swain's leadership stood in exact contrast to her Gallup survey results from midyear of 2021, which were among the best in the company. Ms. McMahon thanked Ms. Swain for her response and scheduled time to regroup that Friday.

105.     During the one-on-one session, Ms. McMahon remarked that she "just wanted this all to go away" and admitted she did not think Ms. Swain was an ineffective leader. She also stated that she was perfectly happy with Ms. Swain leading WJZ. The following week, Ms. Swain returned to the

station in person.  During her second week back, she conducted a "State of the Station" meeting with all employees and proceeded to interview and hire two on-air talents, continuing in her efforts to hire diverse candidates that reflected the demographics of the marketplace and build the future of WJZ. Ms. Swain then had her scheduled one-on-one on Thursday January 13, 2022, with Ms. Roark and all feedback was positive. In addition, both Ms. Roark and Ms. McMahon complimented Ms. Swain on her weekly report.

106.    On January 17, 2022, a company holiday, Ms. Swain received a call from Ms. Charest informing her that she was being placed on Administrative Leave.  Ms. Charest provided no reason for doing so. On January 18, 2022, Ms. Swain received a text message from Rob Weisbord ("Mr. Weisbord"), the COO of Sinclair Broadcast Group, asking if she was alright. He stated that he had received a text from Mr. Cotugno informing him that Ms. Swain was "out on leave again."  Mr. Cotugno's failure to keep private personnel information confidential and decision to disclose such information to a third party was extremely damaging to Ms. Swain's reputation and future employment opportunities.

107.    On January 21, 2022, while Ms. Swain was on administrative leave, the Corporate Compliance team, including Jennifer Gordon, VP Investigations & Employee Relations, and Linda Davidoff, Executive VP & Chief Compliance Officer, asked to meet with Ms. Swain. Ms. Swain assumed the call was in reference to her complaints regarding Mr. Dunn's fraudulent financial activities, the complaints of her team against Mr. Cotugno, or to Ms. Swain's treatment after returning from FMLA leave. Shockingly, Ms. Gordon and Ms. Davidoff stated the reason for the call was to investigate Ms. Swain. They stated further that they were investigating Ms. Swain's real estate holdings in Virginia—vacation properties Ms. Swain purchased after moving back to the East Coast for the job at WJZ. During the call, Ms. Swain expressed that she had hoped the compliance team had

called to investigate AudNet and the subsequent fraud attached to the initiative. The Compliance team indicated that the investigation was because Ms. Swain had not reported to the company that she had "business" interests in Virginia. They apparently deemed the property to be a business, because, at some point, one had been listed on VRBO.com, and a Facebook page existed (created by the previous owner), representing the property as a bed and breakfast.  Ms. Swain explained that the property was newly purchased, that she had never run the property as a bed and breakfast, and the Facebook page mentioned was set up by the previous owner. Ms. Swain further indicated that, regardless of what she was doing with her vacation property in Virginia, she was aware of no company policy requiring her to disclose such property to Paramount.

108.    Many other Paramount employees own vacation properties. Ms. Swain is aware of others who have listed such properties on VRBO.com, but upon information and belief, no other employees were investigated for such real estate holdings. Paramount's sudden interest in Ms. Swain's Virginia vacation property was a guise for alleging misconduct, where no real misconduct could be found, in order to retaliate for Ms. Swain's protected activities.

109.    During the same call on January 21, 2022, Ms. Swain raised her previous reports related to the fraudulent representations related to the company's revenue and the company's failure to take appropriate action, as well as her treatment upon returning from FMLA leave, stating that she believed the retaliation was illegal. Ms. Davidoff and Ms. Gordon said they knew nothing about the fraudulent activities raised by Ms. Swain related to AudNet and inquired further. Ms. Swain again reported the deception and damages that Mr. Dunn and other corporate actors imposed on the company, noting that the company never took any action and terminated the wrong people in response.

110.    Ms. Swain also specifically discussed her disparate treatment upon returning from FMLA leave, stating that she believed her management had retaliated for her protected activity of

taking FMLA leave. She stated that her situation was the equivalent to a person returning from FMLA after breaking a leg, only to have management stomp on the person's leg. Ms. Swain sought help during the call, asking for her claims to be investigated, and she ended the call believing that Ms. Davidoff and Ms. Gordon intended to investigate.

111.    On Tuesday, February 15, 2022, Ms. Swain received a call from Ms. Davidoff, Ms. Gordon, Ms. Glasgow and Ms. Charest. Ms. Charest, whom Ms. Swain had initially reported her management's deceptive practices and stated that she would investigate, led the call. Early in the call, Ms. Charest stated that the complaints from Ms. Swain's direct reports related to abusive conduct by Mr. Cotugno had been resolved, that it was a difference in style, and that he knew about the complaints.

112.    Ms. Swain previously reported that her direct reports had reached out to her during her absence, describing abusive conduct by Mr. Cotugno and that they believed management was on a "witch hunt," intending to remove Ms. Swain, following her return from FMLA leave.

113.    Upon information and belief, Ms. Hostetter, whom Paramount selected to replace Ms. Swain, does not have a disability under the ADA and did not request reasonable accommodations when she applied for the position. Ms. Hostetter had no experience as a general manager and was less qualified for the position than Ms. Swain. Ms. Hostetter's more favorable treatment provides evidence of Paramount's intention discrimination and retaliation against Ms. Swain. Further, upon accepting the position, upon information and belief, Ms. Hostetter did not move her primary residence to Maryland. Instead, upon information and belief, she continues to maintain her primary residence in or around Pittsburg, Pennsylvania. As stated previously, having two residences was one of the allegations relied upon by Paramount to justify Ms. Swain's termination.

114.     Each and every reason asserted for Ms. Swain's termination, including her ownership of a vacation property in Virginia, conflicts with the evidence in this case, and all such reasons were pretext for Paramount's discriminatory and retaliatory motives.

115.     Ms. Davidoff and Ms. Gordon discussed the allegations that Ms. Swain had failed to comply with a company policy by not reporting the vacation property she owned in Virginia, stating that they were not able to determine whether Ms. Swain had an active role in the business. Ms. Swain stated that should be obvious because she never ran the properties as a business.

116.     Upon information and belief, the compliance team was instructed to look into Ms. Swain's property ownership as a potential basis for claiming she was being terminated for cause.

117.     Ms. Davidoff then discussed Ms. Swain's protected activities of reporting the alleged fraudulent activities perpetrated by Mr. Dunn and others, and her ongoing protected activities of raising concerns about ongoing efforts to cover up the deceptive numbers provided to the Board and to shareholders.

118.     Ms. Davidoff, attempting to get Ms. Swain to change her language regarding the conduct, stated that although it appeared Mr. Dunn had engaged in bad business practices, she did not want Ms. Swain to call the conduct "fraudulent."  Ms. Swain, refusing to reframe the illegal conduct, responded, "Would you rather me use the word 'lie'?" Ms. Davidoff was dissatisfied with Ms. Swain's response and stated she was bringing Ms. McMahon on the call. Ms. McMahon was on the call for approximately two minutes, with the sole purpose of terminating Ms. Swain. Ms. McMahon stated that Ms. Swain was being terminated "for cause." Despite Ms. Swain's attempts to find out the basis for her termination, given the timing of it, she never provided the primary reason for her termination. She then stated that Ms. Glasgow would remain on the line to discuss benefits.

119.     Once Ms. Glasgow and Ms. Swain remained on the line, Ms. Swain reiterated to Ms. Glasgow that she had never lied during her employment. Ms. Glasgow struggled to respond. Ms. Glasgow finally provided a reason for Ms. Swain's termination – that the company believed they could not "trust" Ms. Swain anymore. Clearly, the meaning behind this statement was that Paramount could not count on Ms. Swain to remain silent when she observed fraudulent financial practices among other misconduct. In addition, Ms. Glasgow's statements support the other evidence, including the timing of Ms. Swain's placement on leave, that the company no longer viewed her as a viable leader due to learning of Ms. Swain's disability and her need to take a brief period of FMLA leave.  This is particularly so given that the compliance team admitted that they had not been "able" to determine whether Ms. Swain had unreported business interests in Virginia related to her vacation property.

120.     Given that none of the allegations demonstrated any misconduct on Ms. Swain's behalf or was considered terminable for others outside of Ms. Swain's protected classes, Paramount's allegations are pretext for its discriminatory and retaliatory conduct. In addition, Ms. Glasgow's statements that Ms. Swain could no longer be trusted (despite Ms. Swain's success in her position prior to her leave) are consistent with evidence that Ms. Swain was terminated for reporting the fraud on the shareholders and participating in similar investigations, as well as in response to learning of Ms. Swain's disabling condition and her protected activities of taking FMLA leave.  Further, unlike those involved in covering up the fraudulent business practices, Ms. Swain was terminated for cause.

121.     Finally, on February 17, 2022, Ms. Swain received a draft separation agreement from Ms. Glasgow, in which Ms. Swain was to receive only 75% of her bonus from 2021, despite exceeding the budget forecasting for 2021 for her local station, and she would only receive such lower portion of her bonus if she signed a waiver of all claims against Paramount.

122.     Ms. Swain questioned the decision, and Ms. Glasgow responded that while Ms. Swain was "eligible" to receive a bonus, it was still at the discretion of the company.  Ms. Swain was shocked, given that Ms. Swain had led and positioned her station in a manner that exceeded its target and she was due for a 109% bonus, at a minimum. Indeed, Ms. Swain was informed of the numbers previously, because she was responsible for allocating the bonuses of other employees. Ms. Swain's bonus made up approximately 33% of her annual pay, and she had already completed all of the work necessary to earn such bonus. In the past, such bonus was paid to Ms. Swain in December but was due by the end of February. Ms. Swain had already allocated bonuses to bonus-eligible people on her staff, based on the formula that Paramount applied to bonuses. To the extent that any portion of the bonus payment was discretionary, it was only a very small portion.

123.     But for Ms. Swain's disability or Ms. Swain's protected activities, Paramount would not have withheld any portion of Ms. Swain's performance bonus, and such a withholding constitutes illegal retaliation. To the extent Ms. Swain's management considered Ms. Swain's FMLA leave, or her disability or need for reasonable accommodations, in "evaluating" her performance in 2021, such considerations are illegal. Defendant's termination of Ms. Swain and withholding of her bonus in retaliation for her FMLA leave was willful, with a reckless disregard for its violation of the antiretaliation protections of the FMLA.

124.     Following Ms. Swain's termination, in or around April 2022, Ms. Swain sent an email to Mr. Cheeks, specifically requesting that she be paid her bonus for 2021. Ms. Swain never received a response.

125.     Ms. Swain's bonus was a significant part of her compensation and was incorporated into her compensation package at the time of receiving the offer to work for Paramount. Her annual

bonus was offered in Ms. Swain's initial offer letter for hitting her targets at the station and her station's success at hitting 109% of its target in 2021 was due to Ms. Swain's leadership.

126.     Ms. Swain's annual bonus constituted wages under the MWPCL. The withholding of Ms. Swain's bonus for 2021 – a bonus that was held out as compensation for performance in Ms. Swain's offer letter – violated the MWPCL.

127.     Upon information and belief, Ms. McMahon decided that Ms. Swain's annual bonus would not be paid. During Ms. Swain's employment with Paramount, Ms. McMahon controlled Ms. Swain's compensation terms and terms and conditions of her employment.

128.     Upon information and belief, Mr. Cheeks made the decision to withhold Ms. Swain's annual bonus. Further, he exercised authority to control Ms. Swain's compensation terms and the terms and conditions of her employment during her employment with Paramount.

129.     Ms. McMahon, Mr. Cheeks, and Paramount willfully withheld Ms. Swain's annual bonus, and they did so knowingly, despite Ms. Swain's effort to contact Mr. Cheeks regarding the unpaid wages. Defendants' withholding of Ms. Swain's wages under the MWPCL constitutes and aggravated and willful withholding.

130.     Ms. Swain completed all work necessary to earn the bonus prior to the date of her termination. Typically, the bonus was paid out based on whether the applicable station hit its targets during the previous calendar year. WJZ hit 106% of its target, and thus, Ms. Swain was entitled to at least her target bonus, if not more.

## CLAIMS FOR RELIEF

## COUNT I: SOX WHISTLEBLOWER RETALIATION
### (AGAINST PARAMOUNT)

131.     Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

132.    At all relevant times, Defendant was a publicly traded company subject to the provisions of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A.

133.    Plaintiff engaged in protected activity under SOX when she reported and provided information about what she reasonably believed to be fraudulent or illegal activities of Defendant.

134.    Defendant was aware of Plaintiff's protected activity.

135.    Subsequent to, or concurrent with, Plaintiff's protected activity, Defendant took adverse employment actions against Plaintiff, including but not limited to termination of her employment.

136.    The adverse employment actions were motivated, at least in part, by Plaintiff's protected activity, which constitutes retaliation under SOX.

137.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to, lost wages and benefits, emotional distress, and harm to her professional reputation.

WHEREFORE, Plaintiff requests the following relief:

a.  Enter a judgment in favor of Plaintiff and against Defendant for all available relief under SOX, including but not limited to, reinstatement, back pay with interest, and compensation for any special damages sustained as a result of the retaliation;

b.  Award Plaintiff compensatory damages for emotional distress, harm to her professional reputation, and other non-economic harm resulting from the retaliation;

c.  Grant such other and further relief as the Court deems just and proper.

d.  Require defendant to stop discriminating against Plaintiff and Defendant's employees;

e.  Direct Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendants' discriminatory treatment, and make Plaintiff whole for all earnings Plaintiff would have received but for Defendant's discriminatory treatment;

f.  Award Plaintiff back pay, front pay, and other economic losses with interest;

g.  Award Plaintiff compensatory damages for emotional distress, mental anguish, impairment of reputation, personal humiliation and other non-economic harm;

h.  Award Plaintiff reasonable attorneys' fees and litigation costs pursuant to SOX.

i.  Grant such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests judgment in Plaintiff's favor and against Defendants, for economic damages; pre-and post-judgment interest; injunctive relief; and for all other and further relief as this Court or a jury deems just and appropriate.

## COUNT II: TITLE 20 DISCRIMINATION
### (AGAINST PARAMOUNT)

138. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

139. At all relevant times, Defendant Paramount was an employer within the meaning of Title 20, SG §20-606 *et seq*.

140. At all relevant times, Plaintiff was an individual with a disability within the meaning of Title 20, SG §20-606 *et seq*.

141. Plaintiff was qualified to perform the essential functions of her job, with or without a reasonable accommodation.

142. Defendant was aware of Plaintiff's disability after Plaintiff informed Defendant Paramount of such disability, requested leave to treat her medical conditions and reasonable accommodations

related to her disability, and informed Defendant Paramount through verbal conversations between Plaintiff and her supervisors and management of her disabling conditions.

143. Plaintiff informed Defendant Paramount of Plaintiff's need for a reasonable accommodation, and requested such reasonable accommodation to enable Plaintiff to perform the essential functions of Plaintiff's job as GM of WJZ.

144. Defendant Paramount perceived or regarded Plaintiff as a person with a disability.

145. Defendant discriminated against Plaintiff by terminating her employment, based on her disability under Title 20.

146. Defendants' actions were willful and showed reckless indifference to Plaintiff and its violations of Plaintiff's rights under Title 20.

147. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer harm including but not limited to extreme emotional distress, economic hardship and losses, and damage to her career and reputation within her occupational industry.

WHEREFORE, Plaintiff requests the following relief:

a. Declare that the acts and practices complained of herein are in violation of Title 20;

b. Require Defendant to stop discriminating against Plaintiff and Defendants' employees;

c. Direct Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendant's discriminatory treatment, and make Plaintiff whole for all earnings Plaintiff would have received but for Defendant's discriminatory treatment;

d. Award Plaintiff back pay, front pay, and other economic losses with interest;

e. Award Plaintiff compensatory damages for emotional distress and mental anguish;

f. Award Plaintiff punitive damages for Defendant's willful violations of Title 20;

g.  Award Plaintiff reasonable attorneys' fees and litigation costs, as provided pursuant to Title 20; and

h.  Grant such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests judgment in Plaintiff's favor and against Defendants, for economic damages; pre-and post-judgment interest; injunctive relief; and for all other and further relief as this Court or a jury deems just and appropriate.

## COUNT III: TITLE 20 RETALIATION
### (AGAINST PARAMOUNT)

148.  Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

149.  Plaintiff informed Defendant Paramount of Plaintiff's need for a reasonable accommodation and requested reasonable accommodations to enable Plaintiff to perform the essential functions of Plaintiff's job as GM of WJZ.

150.  After Plaintiff requested and used the reasonable accommodation allegedly granted to her by Defendant, Defendant retaliated against Plaintiff by terminating her employment, withholding compensation that would have otherwise been paid to her for her work during the previous year, and damaging her reputation within the television broadcast industry.

151.  Defendants' actions were willful and showed reckless indifference to Plaintiff and Defendant's violations of Plaintiff's rights under Title 20.

152.  As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer harm including but not limited to extreme emotional distress, economic hardship and losses, and damage to her career and reputation within her occupational industry.

WHEREFORE, Plaintiff requests the following relief:

a.  Declare that the acts and practices complained of herein are in violation of Title 20;

b.  Require defendant to stop discriminating against Plaintiff and Defendant's employees;

c.  Direct Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendants' discriminatory treatment, and make Plaintiff whole for all earnings Plaintiff would have received but for Defendant's discriminatory treatment;

d.  Award Plaintiff back pay, front pay, and other economic losses with interest;

e.  Award Plaintiff compensatory damages for emotional distress and mental anguish;

f.  Award Plaintiff punitive damages for Defendant's willful violations of Title 20;

g.  Award Plaintiff reasonable attorneys' fees and litigation costs, as provided pursuant to Title 20.

h.  Grant such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests judgment in Plaintiff's favor and against Defendants, for economic damages; pre-and post-judgment interest; injunctive relief; and for all other and further relief as this Court or a jury deems just and appropriate.

## COUNT IV: ADA DISCRIMINATION
### (AGAINST PARAMOUNT)

153.  Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

154.  At all relevant times, Defendant Paramount was an employer within the meaning of the ADA, 42 U.S.C. § 12111(5)(A).

155.  At all relevant times, Plaintiff was an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

156.  Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

157. Defendant was aware of Plaintiff's disability after Plaintiff informed Defendant Paramount of such disability, requested leave to treat her medical conditions and reasonable accommodations related to her disability, and informed Defendant Paramount through verbal conversations between Plaintiff and her supervisors and management of her disabling conditions.

158. Plaintiff informed Defendant Paramount of her need for a reasonable accommodation and requested reasonable accommodations to enable her to perform the essential functions of her job.

159. Defendant Paramount perceived or regarded Plaintiff as a person with a disability.

160. Defendant discriminated against Plaintiff by terminating her employment based on her disability under the ADA.

161. Defendant's actions were willful and showed reckless indifference to Plaintiff and for its violations of Plaintiff's rights under the ADA

162. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer harm including but not limited to extreme emotional distress, economic hardship and losses, and damage to her career and reputation within her occupational industry.

WHEREFORE, Plaintiff requests the following relief:

    a. Declare that the acts and practices complained of herein are in violation of the ADA;

    b. Require defendant to stop discriminating against Plaintiff and Defendant's employees;

    c. Direct Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendants' discriminatory treatment, and make Plaintiff whole for all earnings Plaintiff would have received but for Defendant's discriminatory treatment;

    d. Award Plaintiff back pay, front pay, and other economic losses with interest;

    e. Award Plaintiff compensatory damages for emotional distress and mental anguish;

    f.   Award Plaintiff punitive damages for Defendant's willful violations of the ADA;

    g.   Award Plaintiff reasonable attorneys' fees and litigation costs, as provided pursuant to the ADA.

    h.   Grant such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests judgment in Plaintiff's favor and against Defendants, for economic damages; pre-and post-judgment interest; injunctive relief; and for all other and further relief as this Court or a jury deems just and appropriate.

## COUNT V: ADA RETALIATION
### (AGAINST PARAMOUNT)

163. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

164. Plaintiff informed Defendant Paramount of Plaintiff's need for a reasonable accommodation and requested reasonable accommodations to enable Plaintiff to perform the essential functions of Plaintiff's job as GM of WJZ.

165. After Plaintiff requested and used the reasonable accommodation allegedly granted to her by Defendant, Defendant retaliated against Plaintiff by terminating her employment, withholding compensation that would have otherwise been paid to her for her work during the previous year, and damaging her reputation within the television broadcast industry.

166. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer harm including but not limited to extreme emotional distress, economic hardship and losses, and damage to her career and reputation within her occupational industry.

WHEREFORE, Plaintiff requests the following relief:

    a.   Declare that the acts and practices complained of herein are in violation of the ADA;

    b.   Require defendant to stop discriminating against Plaintiff and Defendant's employees;

c.  Direct Defendants to place Plaintiff in the position Plaintiff would have occupied but for Defendants' discriminatory treatment, and make Plaintiff whole for all earnings Plaintiff would have received but for Defendant's discriminatory treatment;

d.  Award Plaintiff back pay, front pay, and other economic losses with interest;

e.  Award Plaintiff compensatory damages for emotional distress and mental anguish;

f.  Award Plaintiff punitive damages for Defendant's willful violations of the ADA;

g.  Award Plaintiff reasonable attorneys' fees and costs pursuant to the ADA; and

h.  Grant such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests judgment in Plaintiff's favor and against Defendants, for economic damages; pre-and post-judgment interest; injunctive relief; and for all other and further relief as this Court or a jury deems just and appropriate.

## COUNT VI: FMLA RETALIATION
### (AGAINST PARAMOUNT)

167.  Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

168.  At all relevant times, Defendant was an employer as defined under the FMLA, 29 U.S.C. § 2611(4)(A).

169.  At all relevant times, Plaintiff was an eligible employee under the FMLA, 29 U.S.C. § 2611(2)(A).

170.  Plaintiff exercised her right to take FMLA leave for a serious health condition as defined under the FMLA, 29 U.S.C. § 2611(11).

171.  Upon Plaintiff's return from FMLA leave, she was subjected to adverse employment actions, including but not limited to, termination of her employment.

172. The adverse employment actions were causally connected to Plaintiff's exercise of her right to take FMLA leave, which constitutes retaliation in violation of the FMLA, 29 U.S.C. § 2615(a)(1) and (2).

173. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages and benefits, and other non-pecuniary losses.

WHEREFORE, Plaintiff requests the following relief:

   a. Enter a judgment in favor of Plaintiff and against Defendant for all available relief under the FMLA, including but not limited to, back pay, front pay, lost benefits, pre-judgment interest, and liquidated damages;

   b. Order Defendant to reinstate Plaintiff to her former position or, in the alternative, award front pay;

   c. Award Plaintiff reasonable attorneys' fees and litigation costs, as provided by the FMLA; and

   d. Grant such other and further relief as the Court deems just and proper.

WHEREFORE, Plaintiff requests judgment in Plaintiff's favor and against Defendants, for economic damages, liquidated damages, and for all other and further relief as this Court or a jury deems just and appropriate.

## <u>COUNT V: MWPCL</u>
### (AGAINST PARAMOUNT, GEORGE CHEEKS, AND WENDY MCMAHON)

174. Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

175. Plaintiff completed all work required in order to earn her annual bonus compensation, as of the date that Plaintiff was terminated;

176.   Defendants failed to pay Plaintiff for any of such bonus compensation;

177.   Defendants willfully withheld Plaintiff's bonus payment for work completed in 2022, denying her wages that Plaintiff had already earned prior to her termination, in violation of the MWPCL;

178.   After Plaintiff requested and used the reasonable accommodation allegedly granted to her by Defendant, Defendant retaliated against Plaintiff by terminating her employment, withholding compensation that would have otherwise been paid to her for her work during the previous year, and damaging her reputation within the television broadcast industry.

179.   Defendants' actions were willful and showed reckless indifference to Plaintiff and Defendant's violations of Plaintiff's rights under the MWPCL.

180.   As a result of Defendants' willful and aggravated withholding of wages and violation of the MWPCL, Plaintiff is entitled to treble damages (*i.e.*, "liquidated damages"), and attorneys' fees and costs;

181.   Defendant George Cheeks constitutes an employer under the MWPCL and is individually, jointly, and severally liable for the withholding of wages from Plaintiff in violation of the MWPCL;

182.   Defendant Wendy McMahon constitutes an employer under the MWPCL and is individually, jointly, and severally liable for the withholding of wages from Plaintiff in violation of the MWPCL.

WHEREFORE, Plaintiff requests the following relief:

a.   Declare that George Cheeks and Wendy McMahon are employers within the meaning of the MWPCL, and are therefore individually, jointly and severally liable for such violations;

b. Enter a judgment in favor of Plaintiff and against Defendants, including the named individuals, for all wages due and unpaid, including the withheld bonus;

c. Award liquidated damages up to three times the wage amount due and unpaid, pursuant to the MWPCL, given the willful, aggravated and bad faith nature of the violation;

d. Award Plaintiff her reasonable attorneys' fees, costs, and expenses as allowed by the MWPCL; and

e. Grant such other and further relief as the Court deems just and proper.

WHEREFORE Plaintiff requests judgment in Plaintiff's favor and against Defendants based on all of the preceding paragraphs and allegations within this Complaint.

## REQUEST FOR JURY TRIAL

Plaintiff, pursuant to Maryland Rule 2-325, prays a trial by jury on all issues.

Respectfully submitted,

SMITHEY LAW GROUP LLC

_____
Joyce E. Smithey, Esq. (Bar No. 27531)
Lisa L. Walker, Esq. (Bar No. 24258)
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990 (phone)
(410) 280-1602 (fax)
joyce.smithey@smitheylaw.com
lisa.walker@smitheylaw.com

*Attorneys for Plaintiff*

Date: February 15, 2024