IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AUDRA SWAIN,<br><br>Plaintiff,<br><br>v.<br><br>PARAMOUNT GLOBAL INC. d/b/a PARAMOUNT GLOBAL,<br><br>Defendant. | Civil Action No. 1:24-CV-00458-SAG |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Audra Swain ("Plaintiff" or "Ms. Swain"), through counsel, asks this Court to deny, in part, Defendant's Motion for Summary Judgment ("Motion").

Defendant Paramount ("Defendant" or "Paramount") has purported to create a history of Plaintiff's time at its Baltimore television station that Plaintiff was charged with managing; however, the history presented by Defendant is missing essential information and lacking proper context. With that essential information and context, it is clear that there are material facts in dispute requiring that Defendant's Motion should, in part, be denied. Plaintiff asks that this Court deny Defendant's Motion as to Count I and Count VII.

<u>**LEGAL STANDARD**</u>

The Defendant properly states the legal standard for granting summary judgment. It is appropriate only where "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## SUMMARY JUDGMENT ON COUNT I (SOX CLAIM) SHOULD BE DENIED

Count I involves Plaintiff's protected whistleblowing activities under the Sarbanes-Oxley Act of 2002 ("SOX"). Defendant claims that Plaintiff's complaints about AudNet do not constitute protected activity under SOX and fail because Defendant allegedly took her "complaints seriously, and modified AudNet after conducting a thorough review of the program with input from Plaintiff." [Defendant's Memorandum, at 2] This recitation is in direct contradiction to record facts presented by Plaintiff. When Defendant failed in its attempts to coerce Plaintiff into modifying her statements regarding AudNet, she was immediately fired. In the light most favorable to Plaintiff, a jury could find that Plaintiff was fired for exposing the AudNet fraud or, at the very least, the fraud exposure by Plaintiff was a contributing factor in her termination. As such, this Court should deny Defendant's Motion as to Count I.

### History of AudNet Fraud and Plaintiff's Efforts to Expose it.

This case starts not with August 2021, but earlier in Plaintiff's time with WJZ, the CBS-owned and operated television station in Baltimore. Plaintiff uncovered and then exposed the fraudulent actions of Peter Dunn, the now-disgraced former President of CBS Television Stations, and others. In much the same way that Defendant's Motion attempts to sweep the financial fraud of AudNet under the rug, the actual facts involving Plaintiff are such that the serious misconduct that she uncovered was not cured through the papering over that is described in Defendant's Motion, but instead was still festering at the time that Paramount decided to terminate the person who blew the whistle on the fraud.

Plaintiff first came to WJZ in September 2017 to be the General Manager of the station. She relocated from a similar position in Las Vegas, Nevada where she had managed three stations. She was credited with boosting morale across the workforce at WJZ and creating a news operation that more properly reflected the demographics of the community, a process that often required Ms. Swain to challenge Mr. Dunn's standard hiring practices of few minorities or people of color. The changes implemented had an immediate positive impact on news ratings for the station as well as a revived standard of excellence for WJZ. In her early years, Ms. Swain met and exceeded the company's legitimate expectations of her role, as she continued to do throughout her employment with Paramount. (Statement of Material Facts in Dispute ("SMFD") ¶¶27, 30-31)

During the first quarter of 2018, Michael Whitman, Sinclair Broadcast Group's Corporate Senior Finance Manager, announced a "new" vertical revenue stream that Paramount would be participating in called "AudNet." The idea behind AudNet was ostensibly to sell unsold inventory across the Sinclair Station Platform. Ms. Swain was already familiar with the "AudNet" product, having been exposed to it while working for Sinclair Broadcast Group, where the AudNet product had been developed by Steve Marks, Sinclair's Chief of Operations. Mr. Dunn and others involved in AudNet for Paramount misrepresented AudNet as creating a "new vertical revenue" stream for CBS, a claim Mr. Dunn knew to be false. (SMFD ¶¶2, 4)

During Plaintiff's 16-year tenure at Sinclair Broadcast Group, Ms. Swain wrote their Best Practices for Inventory Management for the Group; she was very aware that most of the profits associated with AudNet were illusory and did not, in fact, represent "new" revenue. Instead, revenue generated by AudNet was often discounted revenue that either corporate or local stations would have otherwise received from the same advertisers, given that many advertisers simply

purchase time through AudNet at a lower rate than they would have paid the station for the same inventory of time. Prior to leaving Sinclair Broadcast Group, Ms. Swain learned that they intended to reach out to other broadcasters regarding securing other broadcast partners, particularly after FCC regulations were relaxed under the Trump Administration in 2016. (SMFD ¶3)

By February of 2019, WJZ's performance metrics were rising to record levels, with a No. 1 audience ranking in the morning, noon, evening, and late newscasts. Plaintiff proved herself as not only an effective and positive leader for WJZ's employees; she also repaired CBS's image and reputation within her own station and drove the performance of the station in the Baltimore market, which proved that the station could be an asset to Paramount's profitability. Even during her last year of employment with Paramount, Plaintiff and her station continued to exceed performance and revenue expectations, while leading the way amongst her peers inside the station group in efforts for increased diversity and inclusion. (SMFD ¶31)

In the Summer of 2019, it was announced that CBS and Viacom would be merging by the end of the year. Throughout the course of the Fall, including during a senior level management meeting in New York City at the end of October, Mr. Dunn continued to proclaim AudNet as being the source of $26M in new found revenue that the company otherwise would not have realized. Senior Financial members of CBS were present at those meetings in which Dunn repeatedly referred to AudNet as a new incremental revenue stream. The displacement of CBS-owned station revenue was, at a minimum, four times the AudNet revenue amount presented by Dunn. Despite Dunn's claim that the AudNet income was new money for CBS, it was not. (SMFD ¶7)

In October 2019, at a General Manager meeting in New York City, Mr. Dunn continued to misrepresent the "new" revenue received as a result of AudNet, bragging that he and his associates had created a combined "$26 million" of new revenue for CBS through AudNet. During the budget meeting, in a discussion of each station's budget numbers, Plaintiff raised the concern of AudNet taking inventory from stations without corporate management adjusting the stations' budget numbers. Mr. Dunn became angered by Plaintiff calling him out on these illusory revenue "increases." Although Plaintiff continued to succeed to the best of her ability within the limitations imposed on her, her concern was with the false representation of AudNet as "new" revenue, particularly, while simultaneously holding local stations to the same budgetary standards. It was not only a misrepresentation of Mr. Dunn's so-called achievements, but it was also irresponsible and unethical to deceive station managers, and the top levels of Paramount itself, regarding the sources of revenue credited to Mr. Dunn. (SMFD ¶6)

Throughout the end of 2019 and into 2020, AudNet continued to be positioned as new found revenue to the company by Mr. Dunn. This portrayal was misleading, particularly given the huge amounts of political dollars being spent in the CBS marketplaces, making the negative impact on the stations even greater due to the loss of inventory now being allocated to AudNet. Mr. Dunn's proclamations and repeated assertions throughout 2020 during multiple meetings with both station and corporate executives that AudNet represented $26M in new revenue was patently false. Mr. Dunn never disclosed the revenue loss associated with the AudNet inventory and the negative impact to the CBS-owned stations and the company as a whole. (SMFD ¶9)

In late January 2021, an article was published in the L.A. Times which brought to light Peter Dunn's financial manipulations. The day after the article was published, Mr. Dunn was

placed on administrative leave pending an external investigation into the claims raised in the articles.  (SMFD ¶10)

The next day, Plaintiff had a conversation with Wendy Charest, Regional Human Resources Manager for her station, regarding Mr. Dunn.  Plaintiff told her emphatically that she needed to know about the financial manipulations and fraudulent characterizations by Dunn regarding AudNet and the falsely positive portrayal of its impact on CBS.  Plaintiff explained to Ms. Charest that this issue needed to be addressed immediately and felt that the timing could not wait for the conclusion of an external investigation.  Ms. Charest assured Plaintiff that she would relay her concerns to the appropriate parties.  (SMFD ¶11)

Within a matter of days, Bryon Rubin, Chief Financial Officer of CBS, was named as Plaintiff's interim supervisor pending the outcome of the investigation into Mr. Dunn.  Mr. Rubin was in the meetings in which Mr. Dunn characterized AudNet as new found revenue to CBS and would have seen the financial impact of AudNet first hand during quarterly stock market reports, annual budget meetings, and the end-of-year performance presentations to the Paramount Board of Directors, recapping and analyzing CBS performance metrics.  (SMFD ¶12)

In the Spring of 2021, Andrew Siegel, then General Counsel for CBS Television Stations (CTS), conducted a training seminar with the WJZ sales and management staff.  The seminars were mandated as part of a Consent Decree issued by the Department of Justice Antitrust Division in response to collusion findings among media companies including CBS, Sinclair Broadcast Group, Cox Enterprises, Scripps Company, Fox Corporation, and Tegna.  The purpose of the training was to reinforce the need to prevent all discussions of rate and price fixing with broadcast competitors within our marketplaces.  (SMFD ¶13)

At that meeting, Plaintiff asked Siegel how the company was handling the decree in light of the ongoing AudNet partnership between CBS and Sinclair, given that AudNet is a product of Sinclair and there was a Sinclair station in the Baltimore market. Plaintiff further explained that through a simple math exercise, Sinclair could determine our rate structure for the AudNet time periods, which would be violative of the Consent Decree. Mr. Siegel appeared confused and commented that Mr. Dunn had told him AudNet was in fact a CBS product that Mr. Dunn had himself created. This was yet another fraudulent misrepresentation of AudNet by Mr. Dunn. (SMFD ¶14)

In April 2021, Wendy McMahon was named Co-Head of CBS News and Stations. In her initial meetings with Ms. McMahon, Plaintiff once again outlined the AudNet platform's impact on the revenue model for CBS and explained that Mr. Dunn had repeatedly mischaracterized the product as $26M in new incremental revenue for the company. Plaintiff also shared with McMahon that during the Anti-Collusion Seminar with her sales staff, Mr. Siegel shared that Mr. Dunn was representing himself as the creator of AudNet. (SMFD ¶15)

Ms. McMahon directed Plaintiff, along with two other general managers, to work in coordination with Mr. Marenghi to determine the viability of AudNet moving forward. Plaintiff was designated by Ms. McMahon as the chief committee member who would discuss the product directly with Mr. Marenghi in an effort to find a suitable path forward. To carry out her responsibilities in this role, Plaintiff compiled all the inventory from the CBS stations and demonstrated the massive financial losses the stations had experienced by utilizing the AudNet product. In July, it was determined that AudNet would be shut down for all CBS stations moving forward. (SMFD ¶16)

Despite the demonstration of AudNet's negative impact on the CBS stations, no effort was made to correct statements made by Mr. Dunn regarding AudNet's annual revenue of $26M being "new found" money the company would otherwise not have realized. For over three years, this performance classification was repeatedly and inaccurately put forth in CBS performance metrics, quarterly reports, and annual shareholders presentations. (SMFD ¶17)

Mr. Marenghi remained President of Sales, and other corporate team members with knowledge of the flawed and misleading AudNet product continued in their roles, including Bryon Rubin, Michelle Scaringella, Chief Financial Officer of CTS, and George Cheeks, CBS Chief Executive Officer. (SMFD ¶18)

In late July of 2021, it was announced that the external investigation into Peter Dunn had concluded. As a result of information gained during the investigation, two general managers were fired, having been deemed complicit in Mr. Dunn's actions. Plaintiff telephoned Cindy Glasgow, President of Human Resources, to express how troubled she was by the terminations. Though she did not profess to understand why the two general managers were terminated, Plaintiff expressed her concerns that many members of Mr. Dunn's team, including those with direct knowledge of AudNet (i.e. Ms. Scaringella and Mr. Siegel) were remaining with the company. Ms. Glasgow thanked Plaintiff for being the "moral compass of the company". Two weeks later, Plaintiff reported these same concerns to Wendy McMahon. (SMFD ¶19)

But the fraud involving AudNet went deeper than CBS Corporate siphoning off advertising minutes from the local CBS stations, such as WJZ. The fraud constituted a violation of a Final Judgment Consent Decree in *United State of America v. Sinclair Broadcast Group, Inc., et al.*, 18-cv02609-TSC, entered by the United States District Court for the District of

Columbia on December 3, 2019.  That ruling directed CBS's Management and Sales Staff to not, directly or indirectly:

>    1.   Communicate Competitively Sensitive Information to any Station in the same DMA [Designated Market Area] Defendant does not own or operate;
>
>    2.   Knowingly use Competitively Sensitive Information from or regarding any Station in the same DMA Defendant does not own or operate;
>
>    3.   Encourage or facilitate the Communication of Competitively Sensitive Information to or from any Station in the same DMA Defendant does not own or operate; or
>
>    4.   Attempt to enter into, enter into, maintain, or enforce any agreement to Communicate Competitively Sensitive Information with any Station in the same DMA Defendant does not own or operate.

See Final Judgment Consent Decree, attached hereto as Exhibit 6, at p. 9.[1]

The AudNet scheme violated this Court Order.  As Plaintiff explained at her deposition:

> My recollection - and we can certainly look into it, but we were under a DOJ, and I believe they still are, a consent decree where we couldn't share information, any pricing, inventory metrics, pacing, competitive.  We were not allowed to share that with the - the competition inside of our market.  Sinclair's home office is in Baltimore.  I raised in a call - we - we were doing training with Andy [Seigel] and his group.

See Swain Deposition, excerpts of which are attached hereto as Exhibit 7, at 158, lines 4-12.

She further explained:

> And in theory, you could back into our rates, which Andy saw that as a possibility, and he expressed, but that AudNet is not a Sinclair product.  Peter [Dunn] created AudNet. . . .  Andy [Seigel] was under the assumption Peter [Dunn] had created . . . . AudNet. . . . And that was a first for me.  I knew that he [Peter Dunn] had represented it as new inventory, which was not accurate, but I did not know he positioned it as a product he had created.

(Swain Deposition at 159, lines 6-22).

---

[1] Exhibits 1-5 are attached to the Swain Affidavit.

**Plaintiff's Exposure of the Financial Fraud Contributed to her Termination**

On February 15, 2022, Plaintiff received a notice that a conference call was scheduled with her, Wendy Charest, Linda Davidoff and Cynthia Glasgow. The call was about matters relating to her continuing work at WJZ. During the opening minutes of the call, Ms. Charest explained that she had concluded her investigation into Chris Cotugno, and that she had determined that the issues complained of by the WJZ Department Heads concerning Mr. Cotugno during Plaintiff's medical leave were simply a "style difference" between his leadership and hers. Ms. Charest said she had "addressed it" with Mr. Cotugno. Next, Ms. Davidoff informed Plaintiff that she had looked into her claims regarding AudNet. Ms. Davidoff asserted that while AudNet did appear to be a flawed business model, she did not want the Plaintiff to refer to the AudNet scheme as "fraudulent." The Plaintiff replied, "Would you rather me use the word 'lie'?" Ms. Davidoff was not happy with her response and promptly brought Wendy McMahon onto the call. Upon joining the call, Ms. McMahon told Plaintiff immediately that she was being terminated "for cause." (SMFD ¶1)

Given that Plaintiff's whistleblower status was referenced in the context of "explaining" the purported reasons for her termination, Plaintiff has direct evidence that management knew about her protected activities, but also that her protected activities contributed to the decision to terminate her.

To survive summary judgment on a SOX claim, the plaintiff must produce evidence sufficient for a reasonable jury to find:

1. The employee engaged in protected activity under 18 U.S.C. § 1514A (e.g., reporting what they reasonably believed to be mail, wire, bank, or securities fraud, or a violation of SEC rules);
2. The employer knew of the protected activity;

3. The plaintiff suffered an unfavorable personnel action;
4. The protected activity was a contributing factor in the adverse action.

The "contributing factor" standard is notably low; the protected activity need only have tended to affect the outcome "in any way." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339 (4th Cir. 2014).

In this case, as set forth above, Plaintiff satisfies all four (4) elements of the SOX cause of action.  Plaintiff engaged in protected activity when she repeatedly notified her superiors of the financial fraud being perpetrated against shareholders through the AudNet scheme and its false claim of generating "new revenue."  The employer obviously knew of the protected activity because Plaintiff informed them.  Plaintiff was terminated from her job immediately following her unwillingness to back off from her assertions of fraud.  Finally, given the timing of the termination immediately following her refusal to back down from her characterization of AudNet as fraud, it is clear that this was a contributing factor to her termination.

It is clear that, from the moment that the Plaintiff alerted the Defendant that there was fraud occurring regarding AudNet, the Defendant looked for any possible reason to fire her. Plaintiff has denied all of the rationales advanced by the Defendant (See SMFD 32-52); thus, it is for the jury to decide if the reasons that the Defendant brought forth for the termination were wholly or even partially pretextual.

If the plaintiff establishes a prima facie case, the employer can still prevail on summary judgment if it shows by clear and convincing evidence that it would have taken the same action absent the protected activity. (*Stone v. Instrumentation Lab. Co.*, 591 F.3d 239 (4th Cir. 2009)). Defendant, however, is unable to meet this high burden, given Plaintiff's consistently excellent performance.

Throughout her tenure at WJZ she was recognized by her staff, peers and members of the corporate staff as one of the top leaders at CBS Television Stations.  She was awarded over 100% of her bonus amount in 2017, 2018 and 2019.  In 2020, she received 110% of my bonus for her performance.  Plaintiff was an active member in the community as a member of the Board of Trustees for the Maryland Science Center and was also appointed by Governor Larry Hogan to serve on the Board of Directors for the Reginald F. Lewis Museum.  She cultivated many community outreach partnerships with various businesses and groups throughout Baltimore, including Light City with the Baltimore Office of Performance and Arts, Weather Day with the Baltimore Orioles, and a complete slate of "Purple Programming" centered around the Baltimore Ravens, demonstrating an annual commitment to Ravens' coverage and creating more local content than any other station in the CBS Television Stations Group.  Plaintiff partnered with LifeBridge Health to create #HealthyMD a medical series designed to provide vital health information to Maryland residents and also created a Town Hall Series of Programs titled "Baltimore: Standing Together" centered on Public Safety, the Opioid Crisis and the Public School System designed to bring together leaders and activists in the community to provide assistance and guidance to those in need.  During Plaintiff's tenure at WJZ, the station returned to dominance in the ratings, often achieving the top audience ranking in time periods across the entire day.  She had the lowest amount of staff turnover among the CBS Televisions Stations Group and often had agents specifically looking to place on-air talent at my station because of her leadership.  She was highlighted in multiple broadcast outlets as being one of CBS Television Stations top General Managers.  In 2019 and throughout 2020, CBS engaged with John LaBianca of JPKG Consulting Group for leadership training with the senior management and general manager teams at CBS.  A Workplace EQ 360 survey was conducted gauging her

leadership by employees at the station, direct reports, peers, and her supervisor, and her scores were among the top of all the general managers in the group. In the Fall of 2020 and again in early 2021, Defendant partnered with Gallup to again conduct leadership surveys throughout the company and Plaintiff's scores, once again, were near the top for all the general managers in CBS. (SMFD ¶31)

### SUMMARY JUDGMENT ON COUNT VII (MWPCL CLAIM) SHOULD BE DENIED

Count VII is Plaintiff's claim that she was entitled to a bonus for her performance in 2021. Defendant claims that her 2021 bonus did not qualify as a "wage" under the MWPCL, because such bonus was not promised by Defendant. There are facts in dispute about whether Plaintiff's job offer letter constituted a binding contract for providing that bonus. It is, therefore, a matter for the jury to determine whether Plaintiff's offer letter promised her the bonus. With these facts in dispute, the legal arguments are the same as they were when this Court ruled on this issue in response to Defendants' Motion to Dismiss, and the ultimate determination should be left for the jury.

The MWPCL "protects employees from wrongful withholdings of wages by employers upon termination." *Aronson & Co. v. Fetridge*, 181 Md. App. 650, 665 (Md. Ct. Spec. App. 2008)(quotation omitted). Under § 3–505 of the MWPCL, employers are required to pay employees "all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." "Wages" are defined under the MWPCL as "all compensation that is due to an employee for employment" and includes "a bonus" or "a commission." *Id*. at §3–501(c)(1) & (2).

The Maryland Court of Appeals has developed a bright-line test for what constitutes wages, which "provides that only when wages have been promised as part of the compensation for the employment arrangement and all conditions agreed to in advance for earning those wages have been satisfied" is the employee entitled to payment. *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 635 (citation omitted). The court in *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 672 (Md. 2001), explained:

> The conditions of employment are determined in advance of the employment. What, if anything beyond the basic salary, the employee will receive is a matter for discussion, consideration and agreement. If a bonus is to be made part of the wage package, it can be negotiated and included in what has been promised. Similarly, whether commissions are to be paid or what fringe benefits attach are matters for agreement in advance of the employment or to become a part of the undertaking during the employment. Once a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages.

Thus, while not every bonus is considered a wage for purposes of the MWPCL, a bonus will constitute a wage when promised in exchange for an employee's work. See *Medex v. McCabe*, 811 A.2d 297, 302 (Md. 2002) (holding incentive bonus was a wage under the MWPCL where it was conditioned upon meeting targets and the plaintiff had performed all work necessary to earn the fees); *Provident Bank*, 383 F. Supp. 2d 858 at 860-61 (D. Md. 2005) (holding that an imputed interest payment sought by a former employee was a "wage" within the meaning of the MWPCL where the company "promised the [former employee] the Imputed Interest payment as inducement for his employment" and the payment was conditioned upon his performance).

While a bonus must be in exchange for the employee's performance to be considered wages under the MWPCL, every dollar thereof need not "'be tied to specific actions by the employee.'" *Blanch*, 124 F. Supp. 3d at 636 n. 8 (quoting *Aronson*, 957 A.2d at 137-38). In *Blanch*, the employer argued that profit-sharing payments do not qualify as wages because they

were based in part on criteria independent of the employee's performance, namely, "business unit ... performance," and thus did not constitute wages under the MWPCL. *Id*. at 635–36. The Court rejected the employer's argument and found that profit-sharing can qualify as wages. *Id*. at 636 ("Accordingly, the possibility that Chubb employees' profit-sharing payments might be based in part on the performance of their business units—and not exclusively on their individual performance—does not carry those payments outside the MWPCL's definition of wages.").

In *Whiting-Turner*, it was agreed at the time the plaintiff was hired that the plaintiff's compensation would consist of a weekly salary "and, after two years of employment and depending upon the profitability of the company, profit sharing." 783 A.2d at 669. Before that two-year period had run, however, the employer offered payment of a profit-sharing bonus, on the condition that the plaintiff remain with the firm. *Id*. The plaintiff declined his employer's offer and quit, but nonetheless sued for the unpaid bonus. *Id*. The court held that the bonus was not a wage under the MWPCL because the plaintiff's compensation package made no provision for a bonus before the end of two years, so any bonus offered before would have been merely a gift or gratuity to which the plaintiff was not entitled. *Id*. at 672. Of note, while the agreement stated that any bonus would "depend[ ] upon the profitability of the company," the court explicitly found:

> Had the respondent been with the petitioner for two years when the decision was made to offer him a bonus and had the financial condition of the petitioner justified it, there would be no doubt of the respondent's entitlement, that he would have earned the distribution in this case. That is so because sharing in the profits of the company after two years was promised as part of the respondent's compensation package.

*Id*. at 673 (emphasis added).

Further, simply because a company maintains some discretion as to an earned bonus does not mean that the bonus is not a wage under the MWPCL. For example, in *Aerotek, Inc. v.*

- 15 -

*Obercian*, 377 F. Supp. 3d 539, 555 (D. Md. 2019), the Court denied the defendant's motion for summary judgment, which argued that a bonus was not a "wage" under the MWPCL because (i) the company handbook stated, "'All performance bonuses are within the sole discretion of the Company....Discretionary performance bonuses are not earned until an employee has performed in a satisfactory manner throughout the entire performance and evaluation period and a bonus amount, if any, has been determined[,]'" *Id.* (citation omitted), and (ii) the employee's offer letter stated, "'You will be eligible for an annual bonus potential of up to $30,000.00 (subject to funding requirements as earned based on individual and company achievement versus goal.).'" *Id.* (citation omitted).

In *In re Nat'l Energy & Gas Transmission, Inc.,* 351 B.R. 323, 332 (Bankr. D. Md. 2006), the Court rejected the defendant's argument that a supplemental bonus was discretionary and therefore was not wages under the MWPCL, and therefore denied the defendant's motion for summary judgment. The Court stated that, while the company had some "discretion" in awarding the supplemental bonuses, that does not mean that the company "could deny bonuses for any reason under the sun." *Id.* at 335. The court further expounded:

> Unless it was the intent of the parties "to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties," there are "at least certain purposes for which the expressly conferred power to [exercise discretion] c[annot] be employed" due to the restrictions imposed by the covenant of good faith and fair dealing.

*Id.* at 333 (alterations in original) (citing cases).

The instant case is analogous to *Anderson v. EtherWANSystems, Inc.,* 2023 WL 200114, at *2-5 (D. Md. Jan. 17, 2023), wherein this Court denied a motion to dismiss the MWPCL count for the non-payment of the plaintiff's year-end bonus. Noting that *Blanch* and *Whiting-Turner*

stand for the proposition that bonuses are not deemed wages under the MWPCL where they "are made as gifts or gratuities and not as part of a wage package," *Id*. at 4, the Court concluded:

> The opposite conclusion should be reached here, where Anderson executed the 2021 Bonus Plan covering "a bi-weekly salary, quarterly and a year-end bonus potential" with EtherWAN that explicitly provides that Anderson could "earn a year-end bonus up to $120,000 for sales ranging between 3% Growth and 150% of Plan." (Bonus Plan at 2 (emphasis added)). Thus, the bonus payment appears, at least at this early stage, to be part of a negotiated agreement regarding Anderson's compensation package tied in some part to his sales performance and not a mere gratuity or gift.

This case is also similar to *Knickerbocker v. AvePoint, Inc.*, 2021 WL 927454, at *7 (D. Md. Mar. 11, 2021), wherein this Court denied a motion to dismiss the plaintiff's MWPCL claim. The Court found that the "plaintiff's MWPCL claim seeks the payment of commissions that are alleged to be a part of his overall compensation plan which, if proven, would constitute wages." The Court expressly rejected the defendant's argument that the commissions were voluntary incentive payments due to language in the governing plan that "provides that defendants 'expressly reserve[] all rights to amend, modify or rescind all or portions of this Plan or its policies at any time with 30 days advanced notice.'" *Id*. at *6.

Plaintiff was hired on September 9, 2017 by the Defendant to be the Vice President and General Manager of WJZ-TV in Baltimore, Maryland. Plaintiff was offered, and accepted, employment based on "a base salary at an annual rate of $330,000." Ms. Swain's offer letter also included her STIP bonus as a key part of her compensation package. Specifically, the offer letter declares: "Your annual 'target' bonus incentive under the Company's Short-Term Incentive Plan (STIP) ***will be*** an amount equal to 50% of your base salary. The precise amount of such bonus payment, if any, will be determined on an annual basis and will depend on Company and individual performance." (emphasis added).

Plaintiff would not have taken the job at WJZ if the bonus was discretionary, as it made up about one-third of her total compensation. Plaintiff understood the offer letter to be clear: if the company and she hit the revenue targets, then she was entitled to a bonus of at least 50% of her salary. (SMFD ¶27-29)

In addition to Plaintiff achieving her goals, WJZ achieved all of its financial and ratings goals for 2021. See Exhibit 4. Company performance had already been determined. Upon Plaintiff's return from leave, she received the station bonus pool amount of 106% from corporate. This calculation was based on exceeding the station budget by $2.06 million. Plaintiff allocated the station pool amount of 106% to her bonus-eligible station employees and subsequently reviewed it with the Human Resources coordinator. During Plaintiff's entire tenure with CBS, her personal bonus amount was always equal to or greater than the station targeted goal. (SMFD ¶30)

Defendant's discretion ended when both Plaintiff and Defendant achieved the financial and ratings goals for the year. Thus, the "if any" part of the bonus provision was met. The only discretion at that point was whether the company would award her *more than* the 50% that was guaranteed to her upon achievement of the metrics, which both she and the company had achieved. As in *Anderson* and *Knickerbocker*, Ms. Swain's bonus payment was owed to her as part of a negotiated agreement regarding her compensation package, and was not a mere gratuity or gift.

Defendants argue that the bonus was discretionary because, in addition to being dependent on Ms. Swain's performance, it was dependent on Paramount's performance. However, cases such as *Blanch* and *Whiting-Turner* make clear that the fact that a bonus is based

in part on the performance of the company "does not carry those payments outside the MWPCL's definition of wages." *Blanch*, 124 F. Supp. 3d at 636.

Defendant also argues that the STIP bonus is discretionary based on the following language concerning the administration of the STIP:

> The Plan will be administered by the Chief Executive Officer ("CEO") and the Chief People Office ("CPO") of the Company (each, an "Administrator"). The Administrators are authorized to interpret the Plan, identify the Participants and determine the amount of any Bonuses and the terms and conditions for payments made under the Plan.

Cases such as *Aerotek*, *In re Nat'l Energy & Gas Transmission*, and *Knickerbocker* make clear that such discretion is not without its limits; indeed, Ms. Swain's STIP bonus was part of her compensation package and Paramount was not free to "deny bonuses for any reason under the sun." *In re Nat'l Energy & Gas Transmission*, 351 B.R. at 335. Moreover, the fact that Ms. Swain was entitled to her annual STIP bonus if targets were met is underscored when contrasted to the language in her offer letter used by Defendants in discussing her eligibility for a LTMIP grant:

> You will be eligible for a long-term incentive grant under the Company's Long Term Management Incentive Plan (LTMIP). You will have an annual "target" value for your long-term incentive equal to $70,000, although your actual long term incentive value, if any, may be more or less than the "target". The award of a long-term incentive grant and the precise amount, timing and form of such grant, shall be determined on an annual basis at the sole discretion of the Company's Board of Directors and its Compensation Committee.

As this Court noted in its Memorandum Opinion, these different terms for the short and long term incentives "suggest that the STIP bonus was not absolutely discretionary, or at least less discretionary than another incentive program." Opinion at 8. At best, the jury should be tasked with clarifying this ambiguity.

## **CONCLUSION**

For the reasons stated herein and the record evidence provided, Plaintiff has demonstrated that there are disputes of material facts relating to Plaintiff's SOX and MWPCL claims which warrant denial of Defendant's Motion to that extent.

    Respectfully submitted,

*/s/ Philip B. Zipin*
Philip B. Zipin, Bar No. 03932
Norman G. Schneider, Bar No. 06463
Zipin, Amster & Greenberg, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910
(301) 587-9373
(240) 839-9142 (f)
pzipin@zagfirm.com
nschneider@zagfirm.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of September 2025, a copy of the forgoing was served via this Court's electronic filing system upon all counsel of record.

*/s/ Philip B. Zipin*
Philip B. Zipin, Esq.