## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **AUDRA SWAIN,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | Civil Case No. SAG-24-00458 |
| | * | |
| **PARAMOUNT GLOBAL INC. d/b/a** | * | |
| **PARAMOUNT GLOBAL,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Audra Swain ("Plaintiff") filed this employment action against her former employer, Paramount Global Inc. d/b/a Paramount Global ("Paramount"). ECF 1. Paramount has filed a Motion for Summary Judgment, ECF 58. Plaintiff opposed the motion as to Counts I and VII, ECF 65, and Paramount filed a reply, ECF 68. Separately, the parties have filed various statements of disputed and undisputed facts, ECF 58-3, 65-1, 68-1. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated below, Paramount's motion will be granted.

### I.    FACTUAL BACKGROUND

Beginning in 2017, Plaintiff worked for Paramount, which later acquired CBS, as Vice President and General Manager of its Baltimore-based television station, WJZ-TV. ECF 58-9. Until 2021, her final full year at WJZ, Plaintiff always received at least 100% of her "target" bonus amount, which is equal to at least 50% of her base salary. ECF 65-2 ¶¶ 1, 5. In 2021, WJZ achieved all of its financial and ratings goals. *Id.* ¶ 16.

Throughout her tenure, Plaintiff disagreed with Peter Dunn, the then-President of CBS Television Stations and at one point her supervisor, about the use and reporting of a program called

AudNet that Dunn employed to sell advertising. *Id.* ¶¶ 20–24. Plaintiff believed Dunn and his associates defrauded other stakeholders regarding AudNet's use and its effect on advertising revenues. *Id.* Separately, in early 2020, Dunn, as Plaintiff's supervisor, counselled her about poor communication and lack of responsiveness. ECF 58-6 at 71:17-73:1.

In 2021, following some press reports of discrimination, harassment, and financial corruption by Dunn, a Human Resources representative asked Plaintiff about her experiences with him. ECF 65-2 ¶¶ 8, 25, 26. Plaintiff did not report discrimination or harassment but mentioned Dunn's fraudulent reporting of revenue numbers. *Id.* at ¶ 26. CBS placed Dunn on administrative leave following the press reports and replaced him soon thereafter with Wendy McMahon. ECF 58-3 ¶ 3; ECF 65-2 ¶ 25. McMahon asked Plaintiff to be part of a small team to investigate the AudNet finances. ECF 65-2 ¶¶ 30, 31. In July 2021, following that team's work, Paramount shut down the use of AudNet for its CBS stations. *Id.* ¶ 31. In late July 2021, Plaintiff called Cindy Glasgow, the President of Human Resources, to express concerns that others with direct knowledge of the AudNet issues remained with the company following Dunn's ouster. ECF 65-2 ¶ 34.

In August, 2021, Plaintiff got a new supervisor when Adrienne Roark took over as President of CBS Television stations for the East Coast Region, including WJZ. ECF 58-29 ¶¶ 3– 5. Roark soon noticed that Plaintiff "was hard to reach, took vacation without leaving anyone in charge or any direction for her staff while she was gone, and did not appear to have a good understanding of what was going on at her station." *Id.* ¶ 13. Shortly thereafter, Glasgow and Roark believed Plaintiff had called another employee a "dumbass" during a virtual leadership meeting. *Id.* ¶ 14; ECF 58-22 ¶ 6; ECF 65-2 ¶ 35. On August 26, 2021, Roark and Glasgow admonished Plaintiff for the incident during a performance review and imposed a week of unpaid leave as

punishment, also demanding performance improvement. ECF 58-29 ¶ 18; ECF 58-22 ¶ 9; ECF 58-6 at 102:18–103:12. When Plaintiff expressed mental health concerns during that same performance review, however, Plaintiff and her supervisors mutually agreed that Plaintiff would step away from her role temporarily and take short term disability leave to address her issues. ECF 58-22 ¶ 9; ECF 65-2 ¶ 37.

During Plaintiff's absence, Roark worked closely with another CBS employee to manage WJZ. ECF 58-29 ¶ 23. Roark discovered, during that period, additional problems at the station including low morale, declining ratings, and serious issues with building maintenance. *Id.* ¶¶ 24–30. She also learned from station employees that Plaintiff lived out of state and rarely came to the station in person. *Id.* ¶¶ 26, 30.

Shortly after Plaintiff's return to work in January 2022, Roark and McMahon held a performance review with Plaintiff to remind her of the need to improve her performance to avoid termination. ECF 58-6 at 122:17–123:14; ECF 58-26 ¶¶ 30–35. They also sent Plaintiff a formal written performance warning regarding her professionalism, leadership, responsiveness, and adherence to deadlines. ECF 58-36.

On January 17, 2022, Roark received a resignation letter from WJZ's Broadcast Operations Manager. ECF 58-29 ¶¶ 50–52; ECF 58-37. The letter, which attached screenshots from Plaintiff's social media accounts, complained that Plaintiff was living in Chincoteague, Virginia, was rarely in the office, and was uncommunicative. ECF 58-37. Thereafter, an HR representative informed Plaintiff, without explanation, that she was being placed on administrative leave. ECF 65-2 ¶ 40. On January 31, 2022, Glasgow received another resignation letter, this time from WJZ's Human Resources Manager, similarly citing Plaintiff's absences and inattentiveness as the reason for her departure. ECF 58-24.

A group from Corporate Compliance, including Jennifer Gordon and Linda Davidoff, contacted Plaintiff to investigate the complaints of wrongdoing that had been made against her. ECF 65-2 ¶ 41. During the investigation, they also interviewed Plaintiff, who again raised the issues with AudNet, along with some issues that her staff had raised about interim management during her leave. *Id.* Plaintiff had a fair opportunity to share her side of the story during the investigation. ECF 58-6 at 140:16–141:20. In the end, the investigation substantiated the complaints about Plaintiff's conduct and did not substantiate the issues Plaintiff had raised about AudNet and interim management.[1] ECF 68-3.

During a post-investigation telephone call, Davidoff told Plaintiff they had looked into her AudNet claims, did not substantiate them, and did not want Plaintiff to use the term "fraudulent" to describe AudNet. ECF 68-2 ¶ 8; ECF 65-2 ¶ 42. Plaintiff asked if "lie" would be preferable. ECF 65-2 ¶ 42. Soon thereafter, McMahon joined the call and told Plaintiff she was being "terminated for cause," without specifying the cause. *Id.*; ECF 58-26 ¶ 49.

Plaintiff was not offered a bonus under the company's Short-Term Incentive Plan ("STIP") for 2021. ECF 58-25. The bonuses for 2021 were calculated by multiplying four factors: (1) the employee's base salary, (2) the employee's STIP target, (3) a Company Performance Multiplier, and (4) the employee's Individual Performance Multiplier ("IPM"). ECF 58-26 ¶ 54; 58-40 ¶ 7; ECF 58-42. An employee's IPM was determined at the discretion of the employee's supervisor. ECF 58-26 ¶ 54; ECF 58-41; ECF 58-42; ECF 58-22 ¶ 25; ECF 58-29 ¶ 61. Supervisors were encouraged to differentiate employees' performance and contribution levels and could give an

---

[1] Plaintiff disagrees with the conclusions reached in the corporate investigation and disputes essentially all of the allegations of poor performance on her part. *See, e.g.*, ECF 65-2 ¶ 44. For the purposes of this motion, this Court credits Plaintiff's version of the events, although ultimately, as will be explained herein, the issue is management's assessment of her performance, not whether that assessment was fair or corrrect.

employee an IPM as low as 0%. ECF 58-40 ¶¶ 20–22. Roark and McMahon, in consultation with Glasgow, set Plaintiff's IPM at 0% for 2021. ECF 58-29 ¶¶ 62–63; ECF 58-26 ¶¶ 55–56; ECF 58-22 ¶¶ 25–26. Their rating was based on the problems with Plaintiff's performance and the results of the corporate investigation into the complaints about Plaintiff. ECF 58-29 ¶¶ 62–63; ECF 58-26 ¶¶ 55–56; ECF 58-22 ¶¶ 25–26.

II.    **LEGAL STANDARDS**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment is warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107

F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

III. **ANALYSIS**

Because Plaintiff did not oppose summary judgment on her disability discrimination and retaliation claims, just two counts remain for this Court's consideration. They are addressed below.

A. **Sarbanes-Oxley Whistleblower Retaliation (Count I)**

Plaintiff asserts that she was terminated in retaliation for making complaints about unlawful activity relating to AudNet. To establish a prima facie case of retaliation against a whistleblower pursuant to the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, a plaintiff must show "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 344 (4th Cir. 2014) (quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 475–76 (5th Cir. 2008)) (footnote omitted). If a prima facie case of retaliation is established, the employer may rebut it by demonstrating that it would have taken the same personnel action in the absence of the protected activity. *Id.* at 345.

Paramount challenges Plaintiff's SOX claim on a number of grounds. This Court concludes that Plaintiff has not shown a genuine issue of material fact that her alleged protected activity was

a contributing factor in her termination and that, even had Plaintiff established a prima facie case, Paramount has established that it would have terminated her employment in the absence of the protected activity.[2]

This Court first assesses whether Plaintiff's whistleblower activity was a contributing factor in her termination. "A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" *Allen*, 514 F.3d at 476 n.3 (quoting *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, No. 04–149, 2006 WL 3246904, at *13 (Admin. Rev. Bd. May 31, 2006)). While the "contributing factor" element is "broad and forgiving," it is not "toothless." *Feldman*, 752 F.3d at 350. At the summary judgment stage, it is a "rather light burden of showing by a preponderance of evidence that the [protected] activities tended to affect [plaintiff's] termination in at least some way." *Id.* at 348.

*Feldman* is particularly instructive. In that case, Paul Feldman worked as the President of Law Enforcement Associates Corporation ("LEA"), a security and surveillance equipment manufacturer. *Id.* at 341. In 2005, LEA's founder, John Carrington, pled guilty to criminal export violations and was barred from certain export activities for five years. *Id.* In December, 2007, Feldman became concerned that LEA had engaged in conduct that could violate Carrington's ban. *Id.* at 342. The issue was discussed at a December, 2007 Board meeting, and a dispute developed between the Inside Directors, Feldman and Martin Perry, and the Outside Directors, who supported Carrington. *Id.* On January 14, 2008, the two Inside Directors, Feldman and Perry, wrote to the United States Department of Commerce about the potentially illegal exports, resulting in a federal investigation of another company partially owned by Carrington. *Id.*

---

[2] This Court therefore will assume, without deciding, that Plaintiff's belief that she was reporting conduct that violated the law was both objectively and subjectively reasonable.

Additional conflicts developed in 2008 between Feldman, on the one hand, and the Outside Directors and LEA's counsel, on the other hand, including disputes about the location of LEA's headquarters and the payment of bills for counsel's services. *Id.* In April, 2009, Feldman and other LEA representatives met with Joseph and Barbara Wortley, shareholders who had expressed an intention to sue LEA. *Id.* During the meeting, instead of trying to talk the Wortleys out of their lawsuit, Feldman agreed with the Wortleys' expression of dissatisfaction with LEA's board. *Id.* In a later meeting in July with the Wortley family, Feldman told them that the Outside Directors were loyal to Carrington rather than LEA. *Id.* After that meeting, Feldman wrote to the Outside Directors to ask them to resign from the Board. *Id.*

On August 26, 2009, an Outside Director told Perry that the Board intended to terminate Feldman because it had lost confidence in him and because of the situation with the Wortleys. *Id.* at 343. He advised that the Board wanted Perry to stay on with LEA. *Id.* Perry told Feldman about the conversation, and neither Perry nor Feldman attended the August 2009 Board meeting. *Id.* The Board terminated Feldman, but not Perry, at that meeting. *Id.*

In analyzing the causation issue, the Fourth Circuit determined that the causal connection between Feldman and Perry's report to the Department of Commerce and Feldman's termination had been severed by the legitimate intervening event (the interactions between Feldman and the Wortleys at which he affirmed their negative view of the Outside Directors instead of convincing the Wortleys not to sue LEA) and the passage of a significant amount of time after Feldman's alleged protected activities. *Id.* at 349. The Fourth Circuit further noted that, "most damaging to his claim" was the fact that Perry had also reported the possible illegal exports to the Department of Commerce but was asked to stay at LEA instead of being terminated. *Id.* Thus, the Fourth Circuit

held, "Feldman has not shown that it is more likely the case than not that this particular activity played a role in his termination." *Id*.

Plaintiff is in a very similar posture with respect to her AudNet allegations. It is undisputed that other general managers (GMs), along with Plaintiff, had expressed complaints about AudNet. ECF 58-6 at 166:5–12; ECF 58-26 ¶ 11. At least two other GMs served on the committee with Plaintiff to investigate AudNet. ECF 58-6 at 166:5–12; ECF 58-26 ¶ 11. Plaintiff offers no evidence that those GMs suffered any adverse consequences.

The parties certainly dispute whether WJZ's ratings improved or declined under Plaintiff's management and whether Plaintiff performed well or poorly in workplace surveys. But it is undisputed that two of Plaintiff's management-level supervisees resigned shortly after her return from leave in January, 2022, citing Plaintiff's management as the reason for their resignations and providing evidence of various transgressions. ECF 58-37; ECF 58-24. Paramount's management fully investigated the allegations in the letters and permitted Plaintiff a fair opportunity to present her side of the story. ECF 58-6 at 140:16–141:20. The results of the investigation confirmed the complaints that had been made by the resigning employees and led McMahan and Roark to determine that they had lost trust in Plaintiff's ability to lead her station and that she should be terminated. ECF 58-26 ¶ 48; ECF 58-29 ¶ 56. All of the decisionmakers have attested that the AudNet complaints played no role in the termination decision. ECF 58-26 ¶ 51; ECF 58-14 ¶ 20; ECF 58-22 ¶ 22; ECF 58-29 ¶ 59.

Even crediting Plaintiff's assertions that both she and WJZ had been performing well, Plaintiff simply cannot establish that Paramount (or McMahon and Roark) considered her to have a strong performance record. *See Feldman*, 752 F.3d at 350 ("Assuming that LEA was successful during this time because of Feldman's efforts, he has offered no evidence that *LEA* considered him

to have a strong performance record."); *see also Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant."). Like in employment discrimination cases, the Court does not weigh the merits of a termination decision in the SOX context, or "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Feldman*, 752 F.3d at 350 (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

On this record, plaintiff has not shown by a preponderance of the evidence that her AudNet complaints played any role in the decision to terminate her employment or constituted any type of contributing factor. Like in *Feldman*, the fact that other leaders made similar complaints and were not fired is damaging to her claim. Plaintiff's renewed attempt to complain about AudNet during the corporate investigation into her own misconduct does not mean that the AudNet assertions had any impact on the termination decision.

Moreover, even if Plaintiff had established a prima facie case that AudNet somehow contributed to her termination, Paramount has amply rebutted the showing with their evidence amounting, in their view, to deficient performance warranting dismissal. "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997). The well-documented record shows here that the reason for Plaintiff's termination was Paramount's serious concerns about her performance and its effect on other employees, not AudNet.

### B. MDWPL (Count VII)

Paramount also seeks summary judgment as to Plaintiff's Maryland Wage Payment Collection Law ("MWPCL") claim, arguing that the bonus Plaintiff claims is discretionary and does not qualify as a wage. Plaintiff disagrees and contends that the bonus is part of her promised wages.

Paramount's contention rests on two documents: Plaintiff's offer letter and the company's STIP. Plaintiff's offer letter stated, "[y]our annual 'target' bonus incentive under the Company's Short-Term Incentive Plan (STIP) will be an amount equal to 50% of your base salary. The precise amount of such bonus payment, *if any*, will be determined on an annual basis and will depend on Company and individual performance." ECF 22-3 at 2 (emphasis added). The STIP provides that "The Administrators are authorized to interpret the Plan, identify the Participants and determine the amount of any Bonuses and the terms and conditions for payments made under the Plan." ECF 22-4 ¶ 2. It further specifies that "No Company employee shall have any claim or right to receive a Bonus under the Plan." *Id.* ¶ 7.

The MWPCL includes "a bonus" among the wages that must be timely paid to an employee. MWCPL at 3-501(c)(2)(i). However, Maryland law is clear that "not all bonuses constitute wages." *Medex v. McCabe*, 372 Md. 28, 36 (2002). Employees are entitled to payment of a bonus as wages "only when wages have been promised as part of the compensation for the employment arrangement and *all conditions agreed to in advance* for earning those wages have been satisfied." *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 635 (D. Md. 2015) (quoting *Catalyst Health Sols., Inc. v. Magill*, 414 Md. 457, 473 (2010)). Where bonuses are "dependent upon conditions other than the employee's efforts, they lie outside the definition [of wages]." *Medex*, 372 Md. at 36.

Plaintiff attested that she understood her "individual performance" to be premised exclusively on WJZ's achievement of its financial and revenue targets. ECF 65-2 ¶ 3. In 2021, WJZ met all of those goals and in fact exceeded its station budget. *Id.* ¶ 16. In prior years, Plaintiff had always received at least 100% of her target bonus. *Id.*

Despite Plaintiff's subjective understandings, nothing in her offer letter or STIP promises her that she will receive a STIP bonus as wages if WJZ meets its revenue goals.[3] Her offer letter clearly stated that the bonus under the STIP, "if any," would depend on "Company and individual performance." ECF 22-3 at 2. Plaintiff offers no support for her understanding that only WJZ's objective financial and revenue targets governed both of those performance metrics. And the STIP, which was clearly referenced in Plaintiff's offer letter as the basis for any prospective bonus, expressly gives the Administrators discretion to determine the "terms and conditions" for bonuses, further informing all participants that "[n]o Company employee shall have any claim or right to receive a Bonus under the Plan." ECF 22-4 ¶ 7.

The uncontroverted evidence shows that, in 2021, four factors were multiplied together to determine the amount of an eligible employee's STIP payment: (1) base salary, (2) the employee's STIP target, (3) a Company Performance Multiplier, and (4) the employee's IPM. ECF 58-26 ¶ 54; 58-40 ¶ 7; ECF 58-42. Paramount offered four witnesses attesting that supervisors enjoyed complete discretion to set their employees' IPMs. ECF 58-26 ¶ 54; ECF 58-40 ¶ 18; ECF 58-22 ¶ 25; ECF 58-29 ¶ 61. And Plaintiff's supervisors explained why they exercised their discretion to

---

[3] At the motion to dismiss stage, Plaintiff had alleged the existence of a set formula that Paramount applied to calculate employee bonuses and that only a small portion, if any, of the bonus payment was discretionary. Those allegations have not been proved in discovery, because the four independent components are multiplied together to determine an employee's bonus. If the discretionary IPM is set at 0% and is multiplied with the other components, it is determinative of whether any bonus is awarded, regardless of the other factors.

set Plaintiff's IPM at 0% for 2021, resulting in her not receiving a bonus. ECF 58-29 ¶¶ 62–63; ECF 58-26 ¶¶ 55–56; ECF 58-22 ¶¶ 25–26.

Plaintiff argues that the existence of discretion is not determinative as to whether a bonus should be categorized as "wages." But the cases cited by Plaintiff do not suggest that she has established a genuine issue of material fact about whether Paramount made an enforceable promise to pay her a bonus as part of her wages. She cites four cases that are easily distinguishable from this one. Two of the cases, *Anderson v. EtherWAN Systems, Inc.*, 2023 WL 200114 (D. Md. Jan. 17, 2023) and *Knickerbocker v. AvePoint, Inc.*, 2021 WL 927454 (D. Md. Mar. 11, 2021) decided motions to dismiss under the easier standard applicable at that stage, not, like here, motions for summary judgment. In *Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539 (D. Md. 2019), the Court denied summary judgment on the issue of whether a bonus was discretionary because the employee had received a "Compensation Letter" containing a list of goals that had to be achieved to earn a bonus, without reference to the company retaining any degree of discretion if the goals were met. *Id.* at 555–56. And in *In re National Energy & Gas Transmission, Inc.*, 351 B.R. 323 (D. Md. 2006), the bankruptcy court denied summary judgment after finding "some support in the record for inferring limitations in the exercise of [the company's] discretion" regarding the award of bonuses. *Id.* at 335.

In this case, there is simply no evidence of any restrictions on Paramount's discretion or that of Plaintiff's supervisors. Both Plaintiff's offer letter and the STIP expressly refer to corporate discretion and the fact that bonuses may not be awarded at all. Four witnesses attested that the supervisors enjoyed absolute discretion to fix an employee's IPM. Plaintiff offers no evidence of any limitations on that discretion, other than her own subjective understanding. Under these

circumstances, she has not met her burden to show a genuine issue of material fact regarding whether the STIP bonus was promised to her as wages, and Paramount's motion must be granted.

IV.    **CONCLUSION**

For the reasons set forth above, Paramount's Motion for Summary Judgment, ECF 58, is granted. A separate Order follows.


Dated:  November 19, 2025                          _____/s/_____
                                                   Stephanie A. Gallagher
                                                   United States District Judge

14